[No. 28257. Department Two. August 25, 1941.]

DEXTER HORTON BUILDING COMPANY, *Respondent and Cross-appellant*, v. KING COUNTY, *Appellant.*[1]

[1] Reported in 116 P. (2d) 507.

*B. Gray Warner* and *Lloyd W. Shorett,* for appellant.

*Evans, McLaren & Lane,* for respondent and cross-appellant.

*The Attorney General* and *R. G. Sharpe, Assistant, amici curiae.*

MILLARD, J.—The county assessor for King county placed, for the year 1938, an assessed valuation of $693,180 (true value $1,386,360) upon the Dexter Horton building, which is located on Cherry street between Second and Third avenues in the city of Seattle. The owner of that building, upon denial of its petition by the county board of equalization for a reduction of the assessment, appealed to the state tax commission, which, after consideration of the factors of cost of reproduction, less depreciation, and income and expected income, reduced the assessed valuation of the building to $652,000 (true value $1,304,000). The owner paid the taxes under protest and instituted this action to obtain a reduction of the assessment to $700,000 true value (assessed valuation $350,000), and to recover the alleged excessive amount of taxes paid under protest on that building. The land value of $157,000 (assessed valuation $78,500) fixed by the assessor is not in dispute. Upon motion of plaintiff, defendant county's demand for jury trial was denied.

The trial court found "that the true and fair value in money" of the building for the year 1938 was $1,021,440 (assessed valuation $510,720), a reduction of $141,280 in the assessed valuation and a reduction of $282,560 in the true value; that the taxing officials had proceeded upon a fundamentally wrong basis; and that the conduct of the taxing officials in fixing the value was so arbitrary as to constitute constructive fraud. Judgment was entered in favor of plaintiff for recovery of that portion of the tax based upon valuation in excess of the value found by the court. Defendant appealed. Plaintiff cross-appealed from the judgment in so far as the court found that the fair value was in excess of $700,000 or in excess of assessment valuation of $350,000.

The first question presented by this appeal is

whether an action to recover illegally exacted taxes paid under protest, instituted under the provisions of Rem. Rev. Stat., §§ 11315-1 to 11315-8 [P. C. §§ 6882-189 to 6882-205] (Laws of 1931, chapter 62, p. 201; Laws of 1937, chapter 11, p. 19; Laws of 1939, chapter 206, p. 772), is properly triable to a jury upon demand of a defendant county therefor.

Counsel for appellant contend that the constitutional provision (Art. I, § 21, state constitution) that "the right of trial by jury shall remain inviolate," and the statutory provisions (Rem. Rev. Stat., §§ 314, 369 [P. C. §§ 8478, 8532]) that an issue of fact in an action for the recovery of money shall be tried by a jury, unless a jury is waived, guarantee a jury trial irrespective of the question whether the action is one at law or a suit in equity; that all cases which were properly triable to a jury at the time of the adoption of the state constitution are still properly jury cases; and that the case at bar would be one properly triable by a jury at the time of the adoption of the state constitution.

Laws of 1873, chapter 15, p. 52, § 206, and § 204 of the Code of 1881, insist counsel for appellant, sustain the position that the case at bar is one which would have been properly triable by a jury at the time of the adoption of the state constitution, as the sections cited provide that an issue of fact shall be tried by a jury, unless a jury is waived, or a reference is ordered.

"An issue of fact, in an action for the recovery of money only, or of specific real or personal property shall be tried by a jury, unless a jury is waived, as provided by law, or a reference ordered, as provided by statute relating to referees." Rem. Rev. Stat., § 314 (Cf. Laws of 1854, chapter 14, p. 164, § 183; Laws of 1869, chapter 15, p. 50, § 208; Laws of 1873, chapter 15,

p. 52, § 206; Code of 1881, § 204; 2 H. C., § 337; Laws of 1893, chapter 127, p. 416, § 33).

"An issue of law shall be tried by the court, unless referred upon consent, as provided in this act. An issue of fact shall be tried by a jury, unless a jury trial be waived, or a reference be ordered, as provided in this act. The waiver of a jury, or agreement to refer, shall be by stipulation of the parties filed, or the oral consent of parties given in open court and minuted in the records: *Provided,* That nothing herein contained shall be so construed as to restrict the chancery powers of the judges, or to authorize the trial of any issue by a jury, when the complaint alleges an equitable claim, and seeks relief solely upon the ground of the equities of the demand made by the pleadings in the action." Laws of 1873, chapter 15, p. 52, § 206.

"All or any of the issues in the action, whether of fact or law, or both, may be referred upon the written consent of the parties; but either party shall have the *right in an action at law,* upon an issue of fact, *to demand a trial by jury.*" (Italics ours.) Rem. Rev. Stat., § 369 (Cf. Laws of 1854, chapter 18, p. 168, § 206; Code of 1881, § 248; 2 H. C., § 381).

Section 248, Code of 1881, the language of which is the same as the present Rem. Rev. Stat., § 369, amended Laws of 1854, chapter 18, p. 168, § 206, by addition of the language "but either party shall have the right in an action at law, upon an issue of fact, to demand a trial by jury." This, clearly, restricts trial by jury, as of right, in a civil action to "an action at law, upon an issue of fact."

It must be conceded—citation of sustaining authority is unnecessary—that the taxpayer's right of recovery for excessive valuation has always been based upon the doctrine of constructive fraud. No change in this has been made by the statute (Rem. Rev. Stat., § 11315-2) which expressly recognizes, as follows, that the basis for recovery remains the same as before:

" . . . *Provided,* That this act shall not be deemed to enlarge the grounds upon which taxes may now be recovered: . . . "

The doctrine of constructive fraud is inherently and exclusively in equity. The very definition of constructive fraud implies a court of equity.

"Constructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or in nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud." Pomeroy's Equity Jurisprudence (3rd ed.), § 922.

When property has been acquired under such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts such holder into a trustee. Perry on Trusts, 309, § 183. Where the existence of the trust is established, the beneficiary is entitled to the aid of the court in enforcement of his rights of ownership against the trustee; the remedy is not one at law. 19 Am. Jur. 154, § 168. All cases involving trusts, regardless of whether the trust be express or *ex maleficio,* are exclusively within the jurisdiction of equity.

The unlawfully collected taxes made returnable by the statute (Rem. Rev. Stat., § 11315-1 *et* seq.) are impressed with a trust. This statute provides that injunctions and restraining orders shall not be issued to restrain the collection of any tax or the sale of any property for the nonpayment of any tax, except where the law under which the tax is imposed is void and where the property upon which the tax is imposed is exempt from taxation; that the act shall not be deemed to enlarge the grounds upon which taxes may now be recovered; and that no claim need be presented to the county for the return of the protested tax. Under this

statute the county, instead of the taxpayer, has the tax during the litigation. The action is one for the restoration of money paid, instead of an action to restrain the collection of the tax. Section 3 of the statute, p. 202 (Rem. Rev. Stat., § 11315-3), describes the judgment which the taxpayer may obtain, in case it be determined that the tax, or any portion of the tax, paid under protest, was unlawfully collected.

In the matter of a levy from which funds are derived for the payment of the judgment for recovery of the tax, § 4 of the statute, p. 202 (Rem. Rev. Stat., § 11315-4), provides for a levy upon all of the taxable property within the county for the amount of all taxes collected by the county for county and/or state purposes held illegal and recoverable by such judgments, which levy shall include legal interest and costs. The statute also provides that the levy for the county tax shall be given precedence over all other tax levies. Throughout the statute the action is described as one for the recovery of taxes paid under protest or for the recovery of a tax. There is no reference in the statute to the recovery as of a debt. Section 7 of the statute, p. 204, provides that:

"Except as permitted by this act, no action shall ever be brought attacking the validity of any tax, or any portion of any tax: . . ." Rem. Rev. Stat., § 11315-7.

In other words, by this statute (Rem. Rev. Stat., § 11315-1 *et seq.*), as we held in *In re Yakima Amusement Co.*, 192 Wash. 174, 73 P. (2d) 519, the exclusive method provided of seeking a reduction of a claimed unlawful or excessive assessment for taxation purposes is by payment, under protest, of the tax as levied and then instituting an action in the superior court to recover that portion of the tax deemed to be excessive.

It may not be correctly assumed that obtaining the

return of the illegally exacted tax is the mere recovery of a debt. In *State v. Pacific Tel. & Tel. Co.,* 195 Wash. 244, 80 P. (2d) 780, we held that, while the statute (Laws of 1933, chapter 191, p. 888, § 16) provided that,

" 'Any tax due and unpaid under this act and all increases and penalties thereon shall constitute a debt due the State of Washington and may be collected . . . in the same manner as any other debt in like amount, . . .' "

the state is not entitled to legal interest on delinquent taxes, in the absence of a statutory provision for the exaction of interest as such, as a tax is not a debt in the ordinary sense of the term.

On the ground that the case at bar is an action for the recovery of money, counsel for appellant invoke Rem. Rev. Stat., § 314, which provides that "An issue of fact, in an action for the recovery of money only, . . . shall be tried by a jury, unless a jury is waived."

Section 204, Code of 1881, is a verbatim copy of Laws of 1873, chapter 15, § 206 (quoted above), which provides that *nothing in* the civil practice act *shall be* so *construed* as *to restrict* the *chancery powers of the judges, or* to *authorize* the *trial of any issue by a jury when* the *relief sought is predicated upon* a *doctrine* which is *inherently in equity.* This is simply declaratory of the procedure which has obtained for centuries. The foregoing, which can afford no comfort to appellant unless the case at bar is solely an action at law, was in effect in 1889, when the state constitution was adopted. Instead of attempting to curtail the chancery powers of the court, the legislature declared that the chancery powers of the courts *shall not* be restricted. In the light of that declaration it is clear that the provision for jury trial on issues of fact for the recovery of money only applies to common-law actions, as dis-

tinguished from suits in equity. The omission of that declaratory provision from Laws of 1893, chapter 127, p. 416, § 33 (the present Rem. Rev. Stat., § 314 quoted above), did not deprive the courts of any of the equity powers inherent in them.

Section 2492, Rev. Code 1919 of South Dakota, provides:

"An issue of law must be tried by the court or by the judge. An issue of fact for the recovery of money only, or of specific real or personal property, must be tried by a jury, unless a jury trial be waived as provided in section 2524. Every other issue is triable by the court which, however, may order the whole issue or any specific question of fact involved therein, to be tried by a jury, or may refer it as provided in sections 2530 and 2531."

It will be noted that the above-quoted statute of South Dakota is in no essential different from our statute (Rem. Rev. Stat., § 314). Rem. Rev. Stat., §§ 314 and 369, providing for jury trial on issues of fact "in an action for the recovery of money only," and "in an action at law, upon an issue of fact," apply, as stated above, to common-law actions, as distinguished from suits in equity. In *First Nat. Bank v. Erling Bros.*, 61 S. D. 364, 249 N. W. 681, 89 A. L. R. 1387, the supreme court of South Dakota said, respecting the right to a jury trial, under § 2492, Rev. Code 1919 of that state, on an issue of fact for the recovery of money only:

"This section, after directing that in certain actions issues of fact must be tried by a jury unless waived or unless a reference is ordered, provides that in other cases issues of fact must be tried by the court subject to its power to order any such issue to be tried by a jury. While the different forms of civil actions have been abolished by the reform procedure, the intrinsic distinction between legal and equitable actions has not been destroyed. *Kenny v. McKenzie*, 25 S. D. 485, 127 N. W. 597, 49 L. R. A. (N. S.) 782; *Byrne v. McKeachie,*

29 S. D. 476, 137 N. W. 343. The distinction is recognized in the provisions of section 2492. Its provisions requiring a jury trial where there is an issue of fact for the recovery of money only or of specific real or personal property include every right which might have been asserted in any case at law under the common-law system. *Gray Construction Co. v. Hyde,* 49 S. D. 543, 207 N. W. 536; *Citizens' State Bank v. Will,* 57 S. D. 411, 232 N. W. 910."

The right to jury trial in an action for the recovery of illegally exacted taxes is dependent upon implication arising from provisions of Rem. Rev. Stat., § 11315-1 *et seq.,* not upon Art I, § 21, state constitution, and Rem. Rev. Stat., §§ 314, 369. By Rem. Rev. Stat., § 11315-1 *et seq.,* the exclusive method is provided of seeking a return of taxes illegally exacted, in which statute there is no right of jury trial provided. The legislature is not restricted by any provision of our state constitution or by any statute from providing any reasonable system for collection of taxes and the recovery of them, without a jury trial, when illegally assessed, providing, only, due process of law is afforded. The United States supreme court so held in *Wickwire v. Reinecke,* 275 U. S. 101, 72 L. Ed. 184, 48 S. Ct. 43, respecting the power of the Congress. See, also, *Unemployment Compensation Commission v. J. M. Willis Barber & Beauty Shop,* 15 S. E. (2d) (N. C.) 4; 35 C. J. 185, § 79.

We agree with argument of counsel for respondent that the purpose of the statute is to enable the public, rather than the taxpayer (as was the case under the former procedure), to have the use of the tax money during the litigation, and that there is no warrant for reading into the statute by implication a requirement that the taxpayer may or must submit his cause to a jury. The language of the statute clearly discloses the legislative intent to leave the legal situation

of the taxpayer and the issues controlling his rights the same as before, except only as to his former right of an injunction against collection of the tax. Under the former procedure the taxpayer retained the money pending the litigation, while under the present procedure the county holds the money. The equitable principles and issues remain the same, regardless of whether the action is one to enjoin the collection of the tax or one to compel a return of the tax.

The cited cases involving the question of actual fraud—a question of fact which could be determined in a law action as well as in an equity case—are distinguishable from constructive fraud cases. The issue of constructive fraud is not merely a question of fact which could be determined by a jury; it is a doctrine inherently and exclusively in equity, one which only a chancellor in equity is authorized to entertain.

Did the tax commission proceed on a fundamentally wrong basis in revising the county assessor's valuation? Does the evidence sustain the court's finding that the value of the property is less than that fixed by the tax commission?

The subject matter of this controversy is a fifteen story, Class A, office building which covers twenty-eight thousand two hundred square feet of land on Cherry street between Second and Third avenues in the city of Seattle. It was completed in 1924 and, with the exception of the White-Henry-Stuart building, is the largest office building in Seattle. The Dexter Horton building has eight elevators, its own heating plant, and is maintained in a high state of efficiency. The lower three floors of this building facing Second avenue are occupied by the Seattle First National Bank. A large corner space of the frontage on Third avenue is occupied by the Puget Sound Title Insurance Company, and a small frontage

is tenanted by a cigar store. In the Third avenue lobby, running in from Third avenue to the elevators, there are shops and small stores. The upper floors are divided into approximately one thousand offices containing about 181,496 square feet of rentable office space. The fourth and the fifteenth floors have only a small amount of actual office space. The typical floor from the fifth to the fourteenth, inclusive, contains about fifteen thousand eight hundred square feet of space. The building is so designed that its space is divided into forty-five per cent outside and fifty-five per cent court space, which spaces command approximately the same rental.

Miss Horton testified that the building cost, including the vaults, $3,208,622.85; that the architects' fees included therein amounted to $122,447.03, but she produced no record disclosing how much was paid in financing or other costs. This witness testified—in what manner the computation was made does not appear from her testimony—that the cost of the building, excluding architects' fees and financing costs, was $2,095,461.61. Counsel for respondent stated that the purpose of putting Miss Horton back on the stand was merely to establish as a matter of record what amount represented architects' fees and the cost of financing and some interest on a bond issue, "all of which were referred to as being included in the total cost figure which was used in the proceedings before the state tax commission." Following colloquy between court and counsel, the witness testified as follows:

"Q. Miss Horton, have you the books of the Dexter Horton Company before you which show the amount of the architects' fees which were used in setting up the total cost of the building, that was used in the State Tax Commission proceedings? . . .

"A. The actual total including the vaults was $3,208,622.85. Q. Have you the record before you how much of that total was architects' fees? A. $122,447.03. Q. And have you the records showing how much was paid in financing costs? A. No, sir, I have not. Q. Well, have you before you a record showing the cost of the building without those items being included? A. Yes, sir, I have. MR. SHORETT: First, what are they? A. Without the architect fees—just the cost of the building. Q. And the cost of financing? A. No, sir. Just the cost of the building. Q. Will you give it to us, please? A. Two million—MR. SHORETT: Is that from your books? A. Yes, sir, it is. I have carried it in here including the architect fees, and I subtracted; $2,095,461.61. THE COURT: Does that include architect fees? A. No, sir. That is the cost of the building. THE COURT: Excluding architect fees? A. Yes, sir."

The Dexter Horton building went through reorganization during the depression under § 77B of the bankruptcy act (48 Stat. 911). The first mortgage bond issue was left at $2,020,000. There is testimony in the record that the value of the bonds was thirty cents on the dollar and that the bonds were selling at probably less than half of what the purchaser considers the intrinsic value of the building. On the whole record we are convinced that the evidence preponderantly supports the opinion of a witness that the security is worth in excess of one million dollars.

Respondent is carrying fire insurance in the amount of $1,500,000 upon the building. On this, appellant bases the argument that, as respondent would hardly pay fire insurance premiums on a valuation of more than the value for which respondent would dispose of the property, a total value, including the undisputed land value of $157,000, of $1,657,000 for the property, is fixed by respondent's own admissions.

Respondent's estimates of values are based for the most part upon the income from the building. The

factors considered by the state tax commission and by appellant's expert witnesses, in arriving at the fair market value of the building, were the estimated cost of reproduction of the building, less depreciation, and the present income, and the income it is anticipated may be, derived from the building. Some experts testified respecting the proper method of computation of valuation based upon net income, upon methods of office management, and related subjects, and the market value of the Dexter Horton bonds and the relation of that value to the value of the building.

Experienced, well-qualified real estate experts were called by both parties as witnesses. The opinions of those experts as to the value of the building are conflicting.

The brief prepared by respondent's experts, used on appeal to the tax commission, contains the statement that the gross annual revenue from the building, if seventy-five per cent occupied, would be $218,000, and that the annual net income of $58,000 before depreciation—this assumes operating costs and taxes of $160,000—would seem to be the very maximum which the building is capable of producing; that

"A prudent investor if considering this type of property would insist upon not less than 6% net return on his investment after a proper allowance for depreciation. Assuming 6% net return and 2% depreciation the Dexter Horton property would show a value of $725,000. However, the investor would only be interested if he was reasonably assured that the income of $58,000 was a continuing income. Otherwise he would demand a much higher rate of capitalization in anticipation of the risk involved."

There is evidence that the very next year at sixty-five per cent occupancy the gross revenue from the building was $228,996.33 and that the net income exceeded seventy thousand dollars.

Based upon their estimates of gross revenue and net income presented in their brief to the tax commission, respondent's experts concluded that the building had a value of $725,000. With knowledge of the record of the building the succeeding year, respondent's experts would not increase the valuation of the building in any appreciable amount. The record of annual gross income derived from the building for the years 1924 to 1939, inclusive, is as follows:

| Year | Gross Earnings |
|------|---------------|
| 1924 | $152,248.29 |
| 1925 | 294,929.35 |
| 1926 | 423,455.74 |
| 1927 | 451,004.02 |
| 1928 | 479,445.05 |
| 1929 | 504,188.02 |
| 1930 | 503,032.04 |
| 1931 | 426,866.20 |
| 1932 | 340,896.26 |
| 1933 | 221,851.93 |
| 1934 | 185,695.55 |
| 1935 | 187,196.59 |
| 1936 | 193,425.79 |
| 1937 | 195,252.75 |
| 1938 | 213,724.79 |
| 1939 | 228,996.33 |

The evidence as to the actual expenses of the building which may properly be deducted from the gross revenue in ascertaining the net income from the building, is inharmonious.

In Exhibit No. 13 (brief of respondent on appeal to the tax commission), operating expenses of the building are shown to be in excess of the figures presented by respondent at the trial in Exhibit No. 2 for the period 1933 to 1939, inclusive. An explanation of the conflict in the figures is that certain trustees' fees were improperly included as operating expenses. Exhibit No. 18, which was prepared and introduced in evidence by re-

spondent, is not in harmony with either Exhibit No. 2 or Exhibit No. 13. The total operating expenses including taxes, reported in each exhibit for the years 1933 to 1939, inclusive, are as follows:

| | Exhibit 2 | Exhibit 13 (Presented to State Tax Commission) | Exhibit 18 |
|---|---|---|---|
| 1933 | $139,597.88 | $153,197.96 | $152,440.88 |
| 1934 | 125,985.01 | 140,421.83 | 146,395.25 |
| 1935 | 125,536.85 | 147,551.92 | 151,803.84 |
| 1936 | 136,295.43 | 146,179.04 | 147,691.86 |
| 1937 | 148,078.81 | 158,088.42 | 159,355.39 |
| 1938 | 147,853.21 | | 156,672.12 |
| 1939 | 149,354.15 | | 158,748.68 |

One expert witness, who testified on behalf of respondent, relied principally upon the income-producing capacity of the building in fixing his valuation. He admitted that with two other real estate experts he presented figures, as follows, for respondent in the appeal to the tax commission:

Assuming that the building's office space was seventy-five per cent occupied at the same rate per square foot as the fifty per cent then rented, the building would produce a gross annual revenue of $218,000 from which should be deducted operating costs and taxes aggregating $160,000; that the net income before depreciation would be $58,000, "which would seem to be the very maximum which the building is capable of producing." Further assuming a six per cent net return and two per cent depreciation, the property would show a value of $725,000. Respondent's brief on appeal to the tax commission further recites that

". . . the investor would only be interested if he was reasonably assured that the income of $58,000 was a continuing income. Otherwise he would demand a much higher rate of capitalization in anticipation of the risk involved."

The average office vacancy of the building for the years 1933 to 1938 was stated to be thirty-nine per cent, and that, as the average net earning for the same period before depreciation was $46,900, that amount if capitalized at eight per centum per annum would make a valuation of approximately $585,000.

In 1939 when the building was sixty-five per cent occupied, or an occupancy ten per cent less than the figures presented by respondent to the tax commission for 1938, the net profit, before depreciation, was $70,247.65, or $12,000 more than the "very maximum which the building is capable of producing," according to the opinion of respondent's experts on appeal to the tax commission. This expert stated before the tax commission that the property had a value of $725,000 as of January 1, 1938. At the trial of the cause he was of the ". . . further opinion that this particular property, in view of all the factors that enter into valuation thereof, as of January 1938, had a value of from $750,000 to $800,000." Respondent's experts, before the tax commission, were of the opinion that an investor would want six per cent net return on his investment, after a two per cent allowance for depreciation, or a total of eight per cent allowance for interest and depreciation. With the exception of one witness, the real estate experts were in agreement that the net return should be six per cent and depreciation allowance two per cent or a total of eight per cent allowance for interest and depreciation. The dissident expert used eight per cent net return and four per cent depreciation in the trial of this cause.

Five separate analyses of the income from the building (Exhibit No. 24) were made by one of respondent's experts. In the first analysis, which is based on the assumption that 1939 income will continue for the next five years and that present assessed value of the land

and improvement will remain the same for that period of time, the net income after depreciation is approximately $18,000. On the assumption that space will be eighty per cent occupied at the average rental of $1.44 a square foot and based on assessor's value for land and building thereon, in his second analysis the net income after depreciation is about $44,000. The third analysis is based on an average income for a five-year period from 1933 to 1937, inclusive. His fourth analysis is based on an average income for seven-year period from 1933 to 1939, inclusive. In his fifth he estimates the annual income for the next five years at $225,000 and deductions of $141,224, making the net income $83,776 before depreciation, or ten per cent on a valuation of $837,000. In the third, fourth, and fifth analyses there would not be any net income after depreciation. The valuations in those three analyses are $379,300; $449,-890; and $837,000.

Another real estate expert, called by respondent, testified that the property was worth $750,000. Analyzing the testimony of this witness, the valuation of the property, capitalizing the net income from the property before depreciation at ten per cent, is in excess of one million dollars.

Another real estate expert, called as a witness for respondent, testified that the cost of the building, less depreciation, is entirely out of line with the actual value of the property, hence that method of computation of value is of no practical importance. He was also of the opinion that the competitive basis—sales of similar property—was of no particular value, and that the only method which could be properly considered is the capitalization method. He took into consideration the rental income and operating costs of the building and other factors considered by the other experts. In his computation of capitalized value he raised the

occupancy to seventy-five per cent, or a vacancy of twenty-five per cent, and the average rate per square foot of $1.44 which made the total income $252,000. From this he deducted operating expenses of $101,-154.66, to which he added $8,310 figured as increased operating expense on account of the additional 16,620 square feet of space, at fifty cents a square foot, to bring the occupancy up to seventy-five per cent. Taxes were figured at $21,585. If the operating expenses and taxes totaling $131,049.66 be deducted from the gross income, the net income on the figures of this expert witness would be $120,950.34. However, it was the opinion of this expert that, after making proper deductions from the gross income of $252,000, the net income would be $102,378, which should be capitalized at twelve per cent before depreciation, which figure includes eight per cent return on investment and four per cent depreciation. His estimate of the value of the property was $850,000.

Respondent's experts, in brief on appeal to tax commission, were of the opinion that the gross revenue of the building would be $218,000 if it were seventy-five per cent occupied and that the net income before depreciation of $58,000 was the very maximum which the building was capable of producing. At the trial of this cause one of respondent's experts testified, as recited above, that the gross revenue if the building were seventy-five per cent occupied would be $252,000 ($34,000 more than shown in brief to tax commission) and that the net income before depreciation would be $102,378. While the net income is seventy-six per cent more than the maximum estimate before the tax commission, the witness increases his estimate of the value of the building from $725,000 to only $850,000. Before the tax commission this expert, and the other two real estate experts, used six per cent net return and two

per cent depreciation. In the trial of the cause, this expert used eight per cent net return and four per cent depreciation. There is other testimony in conflict with the testimony of this witness from which it would appear that the additional occupancy would add about eight thousand dollars more to the net income from the building.

One real estate expert, called by appellant, testified that, based on respondent's statement in its brief on appeal to the tax commission of $3,208,000 as cost of construction of the building, "if the building was a fifty-year building, as set up in this same memorandum, it would depreciate at the rate of two per cent a year, . . ." the present depreciated reproduction cost of the building is $2,078,000. He discounted the comparison method of valuation because of lack of sales of comparable properties. He testified in detail concerning the earnings of the building. For the purpose of capitalizing the income he used a seventy-five to eighty per cent occupancy (one of respondent's witnesses also assumed an eighty per cent occupancy) and arrived at a valuation of $1,429,000 which he testified was the market value of the building and land. The admitted market value of the land is $157,000.

One real estate expert called by appellant testified that the three usual methods of approach—reproduction cost less depreciation, comparison approach, and capitalization of income—were followed by him in appraising the Dexter Horton building. His estimate of the net depreciated value of the building, exclusive of the bank vaults and not including any financing cost or interest during construction, was $1,616,800. He testified:

"Now for simplicity in figuring and to be fair to the building, let's take their cost in round figures of $2,240,000.00. Take depreciation for fourteen years. That is 1924 to 1938 span. Based on a 50-year life, a 2

percent rate, $623,200.00, gives a net depreciated value of $1,616,800.00."

This witness assumed the value on the comparison approach by deeming the sale of such old-fashioned buildings as the Lowman building, the southeast corner of Third and Cherry, and the Mehlhorn building as valuable only as a basis for fixing land value, which is not in dispute in this case. There has been no sale of a building of comparable size to the Dexter Horton building since the sale in 1928 of the Medical Dental building.

In computation of the valuation based on capitalization of net income, he took an assumed occupancy of seventy-seven and one-half per cent, which is two per cent less than the average in Seattle for class A buildings, and assumed that as new space was rented it would average $1.55 per square foot. Existing space is rented for $1.44 per square foot. The stabilization price is $1.91. This gives an overall gross of $281,630. From this he deducted $165,000 for operating expenses and taxes which leaves a net income before depreciation of $116,630. Assuming a fifty-year life for the building, a useful life of thirty-three years remain. Using the sinking fund method of computing depreciation, he testified that the annual depreciation reserve required to be set aside is $23,680, leaving a net after depreciation of $92,950, which capitalized at six per cent gives a land and improvement valuation of $1,549,000.

He pointed out that the Washington Mutual Savings Bank had recently made major improvements to its building; that the National Bank of Commerce owns its own building; that the Pacific National Bank has moved southward; that the Bank of California owns its building; that the Canadian Bank of Commerce has just renewed its lease and that the Seattle Trust and

Savings building is showing a substantial income. He testified concerning other substantial tenants in the same district as the Dexter Horton building and gave as his opinion that the financial district was well anchored. He testified that the value was between $1,250,000 and $1,500,000; that if he were advising a buyer he would suggest that he offer around the first figure and that if he were advising a seller he would suggest that the property be held at the latter figure. He admitted that the market for this type of property was a narrow one, and stated that if he were to negotiate a sale he would want an exclusive marketing contract for a year or eighteen months.

An architect who designed a number of large buildings and who was later manager of the Dexter Horton building from July 1, 1936, until May, 1937, testified in detail concerning the arrangement, lighting, heat, etc., of the building. He testified the building would reach a seventy-five per cent occupancy within a reasonable time; that under good management it would reach the average of office buildings of its class in the city, which was eighty per cent, and that the rental rate was bound to increase with an increase in occupancy. At seventy-five per cent occupancy he estimated a total gross income of $276,130; that with eighty per cent occupancy the gross income would aggregate $301,762; and that the net income after deduction of operating expenses would be $137,762.

Respondent's experts at the trial figured the economic life of the building, which is sixteen years old, at forty years and the rate of depreciation two and one-half per centum per annum, but in the hearing before the tax commission they used as a basis for their computation a fifty-year economic life and two per centum depreciation per annum. Appellant's experts figured the economic life of the building was fifty years. The tax com-

mission, a member of that commission testified, used a seventy-year economic life based upon the tax commission's diminishing curve or sinking fund method. The trial court was of the view that the building had a fifty-year economic life. The court said:

*"The sinking fund method of depreciation and the straight line method.*

"These two methods were testified to at great length and discussed by councel as having important bearing upon their respective contentions. Before discussing these two methods I may state that after considering all the testimony I have reached the conclusion that this building has a fifty-year economic life instead of a forty-year or seventy-year economic life—that is, that from now on its economic life is thirty-four years instead of twenty-four years, although plaintiff strenuously insisted that its full economic life was forty years.

"To review the reasons for reaching this conclusion would unduly extend this opinion, which has already reached undue proportions.

"The Tax Commission followed the sinking fund method, as testified to by Mr. Jenner. This gives the building and improvements a remaining economic life of 67%, or an added value of 34%, by assuming a seventy-year life instead of forty. On the basis of fifty years, the remaining value would be 57%, or an added value of 14% by assuming a fifty-year life instead of forty. If the straight line method of depreciation is adopted, then on the basis of seventy years the remaining value would be approximately 77%, or an added value of approximately 30% by assuming a seventy-year life instead of forty. If fifty years is adopted, then the remaining life would be approximately 68%, or an added value of approximately 13% by assuming a fifty-year life instead of forty. So that, according to the Tax Commission, there is very little difference in the application of either method.

"Inasmuch as the state Tax Commission has given this building an economic life of seventy years, and I have reached the conclusion that its economic life

should not exceed fifty years, it is my opinion that the Commission adopted a fundamentally wrong basis in exercising its appellate power in the matter of revising or correcting the county assessor's figures."

Under the curve line depreciation method (sinking fund method) adopted by the tax commission, thirty-three per cent depreciation was allowed. Under a fifty-year straight line depreciation method, as found by the trial court, thirty-two per cent depreciation would be allowed.

In computing depreciation, respondent's experts used straight line depreciation method which means that, on a building with a fifty-year economic life, two per cent of the invested capital, together with interest upon the total investment, is returned to the owner each year. Appellant's experts used the sinking fund method under which the owner is allowed a reasonable rate of interest upon his investment and sufficient reserve is deducted each year which, when invested at an absolutely safe rate, will recoup the entire investment at the end of the building's economic life. The trial court made no finding upon the method of computing depreciation, but, from our examination of the record, we are convinced that the weight of the evidence favors the sinking fund method of arriving at depreciation.

The tax commission did not proceed on a fundamentally wrong basis in revising the county assessor's valuation of the building. In revising that valuation the tax commission had before it computations based upon a capitalization of income, evidence of sale of other buildings, and a depreciated reduction cost estimate. The tax commission took into account all favorable and unfavorable circumstances controlling the present value of the property when placed on the market to be sold by the owner. In valuing the build-

ing for taxation purposes, the tax commission was mindful of the rule that the property shall be considered with all of its burdens as well as its benefits. *Bellingham Community Hotel Co. v. Whatcom County,* 190 Wash. 609, 70 P. (2d) 301.

On January 1, 1938, the depreciation given to the building on the seventy-year curve line basis was thirty-three per cent. This method allows heavy depreciation during the first years of the life of a building and less depreciation during the later years. Straight line depreciation upon a building sixteen years old, having a fifty-year economic life, would be thirty-two per cent. It is clear that the tax commission did not proceed on a fundamentally wrong basis and that respondent was not prejudiced in giving the building an economic life of seventy years based upon the sinking fund method of depreciation.

 The evidence does not preponderantly support the court's finding that the value of the property was less than that found by the tax commission. The valuation fixed by the court is not based upon any evidence before the court. The court's valuation of $1,021,440, or an assessed valuation of $510,720, is at a wide variance with the valuation fixed by any of the experts. The court's finding of value is merely a "splitting of the difference." The court took a figure about half way between the valuations fixed by the two sets of experts and substituted its opinion of valuation for that of an administrative board (tax commission) of three qualified experts in the field of taxation. Particularly pertinent is the following language from the opinion of the United States supreme court in *Railroad Commission v. Rowan & Nichols Oil Co.,* 311 U. S. 570, 61 S. Ct. 343:

"Nor, on the basis of intrinsic skills and equipment, are the federal courts qualified to set their independent judgment on such matters against that of the chosen

state authorities. For its own good reasons Texas vested authority over these difficult and delicate problems in its Railroad Commission. Presumably that body, as the permanent representative of the state's regulatory relation to the oil industry equipped to deal with its ever-changing aspects, possesses an insight and aptitude which can hardly be matched by judges who are called upon to intervene at fitful intervals."

The evidence does not warrant the trial court's disregard of the finding of a duly constituted administrative body—the tax commission—and substituting its judgment for that of the administrative body. The statute does not, nor do the authorities, justify usurpation of the assessing power by the courts. The statute, which provides for assessment of property for taxation, reads as follows:

"All property shall be assessed fifty per cent of its true and fair value in money. In determining the true and fair value of real or personal property, the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation; nor shall he adopt as a criterion of value the price for which the said property would sell at auction, or at a forced sale, or in the aggregate with all the property in the town or district; but he shall value each article or description of property by itself, and at such price as he believes the same to be fairly worth in money at the time such assessment is made. The true cash value of property shall be that value at which the property would be taken in payment of a just debt from a solvent debtor." Rem. Rev. Stat., § 11135 [P. C. § 6882-52].

In *Bellingham Community Hotel Co. v. Whatcom County*, 190 Wash. 609, 70 P. (2d) 301, we held that the foregoing section of the statute, which provides that all property shall be assessed for taxes at fifty per cent of its true and fair value in money and specifies the manner of determining the same, requires

assessment at its fair market value at the time when made; and that it is error to consider only the estimated cost of reproducing a building, less depreciation, without taking into account all favorable and unfavorable circumstances controlling its present value when placed on the market to be sold by the owner. See, also, *Metropolitan Building Co. v. King County*, 72 Wash. 47, 129 Pac. 883.

The tax commission and the experts who testified on behalf of appellant considered the depreciated reproduction value of the building and the income as a guide in determination of the value of the property. No comparable building had been sold in twelve years, hence comparative sales were of little aid in determination of value of the property.

The case at bar is distinguishable on the facts from a number of cases cited by counsel for respondent in which cases the assessing body adopted a fundamentally wrong basis of procedure in making the assessments.

In *Bellingham Community Hotel Co. v. Whatcom County*, 190 Wash. 609, 70 P. (2d) 301, the factor of income, which could be derived from the property, was not taken into consideration.

In *Adams County v. Northern Pac. R. Co.*, 115 F. (2d) 768, the question was presented as to the correctness of the assessed valuation found by the state tax commission on certain railroad property. The following language from that opinion, as to the rule to be followed in such cases, is apt:

"Before taking up in detail the methods used by the Commission and the objections thereto as raised by the plaintiff Railway Company, the special master and the trial court, it will be necessary to consider briefly the respective functions of the State Tax Commission and the courts with relation thereto. The duty of assessing property for taxation and fixing the value at which it shall be assessed is confined to taxing

officers, in this case the Tax Commission. When judgment is to be exercised as to value it is the judgment of the Taxing officer that must prevail. Broadly speaking, these values are conclusive upon the court and cannot be changed by the court by injunction or otherwise unless the value thus fixed is so excessive and arbitrary as to evidence actual fraud or constitute constructive fraud in fixing such valuations. . . .

"From what has been said it is obvious that the Commission's valuations cannot be overcome by showing that some other method of valuation, even a preferable method, might have been used. Valuation is an expression of opinion and judgment and the state law requires the exercise of that judgment by the Commission. As already shown, it is only when an erroneous method results in grossly excessive valuation that the courts may interfere with the Commission's valuation. For that reason much of the discussion in the briefs dealing with the comparative merits of the methods used by the Commission and the master is wholly immaterial."

We have been consistent in holding that the mere over-valuation of property by the taxing officials, if they act in good faith and in the honest exercise of their judgment, furnishes no ground for relief, it being presumed that the taxing officials have done their full duty in fixing the valuation of the property; that, while equity will interfere when the taxing officials fraudulently, capriciously, or tyrannically refuse to exercise their judgment by adopting a system of valuation designed to operate unequally, and to violate a fundamental principle of the constitution, equity will not interfere to correct mere mistakes or inadvertences, or to set aside the judgments of taxing officials in relation to values. *Andrews v. King County,* 1 Wash. 46, 23 Pac. 409, 22 Am. St. 136; *Templeton v. Pierce County,* 25 Wash. 377, 65 Pac. 553.

In *Hillman's S. C. L. & R. Co. v. Snohomish County,* 87 Wash. 58, 68, 151 Pac. 96, we said:

"In *Templeton v. Pierce County, supra,* the court reviewed many of its prior decisions, summarizing them to the effect that the court will grant relief against an arbitrary, fraudulent or maliciously excessive valuation by the assessing officer, and fraud may be presumed from a palpably exorbitant overvaluation, but where the assessing officer has exercised an honest judgment and no fraudulent, arbitrary or capricious action in making the assessment is shown or can be presumed, the court will not interfere; that where it appears that there has been an honest endeavor to get at the true value and there is room for an honest difference of opinion as to the value, the judgment of the officer is conclusive; that if property, though overvalued, be assessed in the same proportion as other like property, and the system of valuation adopted operates equally on all other like property, the constitutional provision as to uniformity is complied with."

In *Northwestern Imp. Co. v. Pierce County,* 97 Wash. 528, 167 Pac. 33, we said:

"In reviewing these assessments, we must bear in mind that we are dealing largely with questions of opinion as to the value of these lands for the purpose of taxation. It has too long been the law to be now doubted that equity will not interfere to set aside the opinion of taxing officers in fixing the value of lands for purpose of taxation until it is shown that such arbitrariness or inequality enters into the assessment as to violate the fundamental principles of taxation. It is also well settled that, in making an assessment, it is presumed the assessor has only performed his full duty, and the burden of showing otherwise is cast upon those who attack it."

See, also, *Swanson v. Snohomish County,* 191 Wash. 389, 71 P. (2d) 170, in which we said:

"The principal question in this case is whether the valuation placed upon the property by the assessing officers was excessive. There is a presumption in favor of the assessment, and the burden of proof rests upon the property owner to show by clear and convincing

evidence that the land was assessed at such an excessive valuation as to amount to constructive fraud. *Northwestern Imp. Co. v. Pierce County*, 97 Wash. 528, 167 Pac. 33; *Northwestern & Pacific Hypotheekbank v. Adams County*, 174 Wash. 447, 24 P. (2d) 1086."

In *Crosby v. Kitsap County*, 154 Wash. 212, 281 Pac. 494, the appellants contended that their property was assessed at such over-valuation as to amount to constructive fraud on the part of the assessing officers. The property there in question was an apartment house which sold in 1921 for $150,000 and resold in 1924 for $45,000. In 1921 the county officials fixed a valuation of $45,000 on the property. Taxes were levied on that basis from 1921 until 1926. In 1926 the property was assessed at $97,000 or a taxable value of $48,500. In 1927 the property was assessed at $96,860 actual value or a taxable value of $48,430. Appellants tendered payment of taxes upon the property based upon an actual valuation of $45,000. We did not hold in that case that the property should be appraised upon a purely income basis. We said:

"The rental received for the past two or three years was an item to be shown as tending to establish the actual cash value of the building, and the court properly considered that as tending to show the fair market value of the property. To be deducted from this annual income of twelve thousand dollars, was a total amount of $5,250 for taxes, depreciation and repairs, which appellants' expert witnesses testified should be deducted from the rental income. A net income would remain for the appellants of $6,750. If this amount were capitalized at eight per cent, the valuation of the property would be $84,375. If capitalized at seven per cent, the valuation would be $96,425. There is no such disparity between the assessed actual value of $97,000 and the foregoing computation of value as to raise a presumption of fraud on the part of the assessor.

"It is to be presumed that the assessing officials did their duty in making the assessment. They testified

as to the market value of the property, and their testimony as to the assessment they made is, as between the appellants (the complaining taxpayers) and the respondents (the taxing district) evidence of market value, and in the absence of a showing by the appellants of gross overvaluation constituting fraud, the judgment of the taxing official as to the fair market value will not be disturbed by the courts.

" 'The mere overvaluation of property by the assessor, if he acts in good faith, and in the honest exercise of his judgment, furnishes no ground for relief in equity.' *Templeton v. Pierce County*, 25 Wash. 377, 65 Pac. 553.

"The trial court found the valuation not excessive. Under the evidence of this case, there was not such a showing of excessive valuation as to entitle appellants to relief. The cases cited by appellants in support of the contention that the courts will relieve against excessive valuation above a true value are not applicable to the facts in the case at bar. Accepting the basis on which appellants relied in the trial court as the basis of the real value of the property—the earnings of the building—the appellants have not shown that the property was valued greatly in excess of the real value of the property."

The taxing officials are not required to rely exclusively upon capitalization of income in fixing the fair value of the property, but are required to take into consideration every factor affecting the true cash value of the property.

 Finally, counsel for appellant contend, assuming that the valuation of $1,021,440 found by the court was correct, the difference between that figure and the valuation of $1,304,000 fixed by the tax commission is not sufficient to constitute constructive fraud. That is: Was there such disparity between the tax commission's valuation of respondent's building and the valuation found by the court as to constitute constructive fraud? This question, like the other three presented by this appeal, must be answered in the negative.

There is no showing of actual arbitrariness or capricious action upon the part of the tax commission in valuing respondent's building, hence respondent is not entitled to a recovery unless there is such a great disparity between the valuation fixed by the tax commission and the valuation found by the court that it amounts to constructive fraud.

There is no fixed rule as to the disparity required between the value fixed by the assessing officials and the value found by the court to establish constructive fraud. There is, as we stated above, a presumption in favor of the assessment and the burden of proof rests upon the property owner to establish by clear and convincing evidence that the property was assessed at such an excessive valuation as to amount to constructive fraud. *Bellingham Community Hotel Co. v. Whatcom County*, 190 Wash. 609, 70 P. (2d) 301; *Swanson v. Snohomish County*, 191 Wash. 389, 71 P. (2d) 170.

An interesting article, in which is reviewed the cases of this court on the doctrine of constructive fraud in the law of taxation, from the pen of Mr. John N. Rupp, will be found in volume 12, p. 205 *et seq.*, of the Washington Law Review. Quite apt is the following language:

" . . . it is submitted that a taxpayer seeking relief on the short ground of excessive over-valuation will do well to come to court armed with clear and convincing proof of an over-valuation of at least double the fair cash value of the property if he wishes to prevail on that ground alone; if he cannot produce such evidence he had better rely exclusively on the tender mercies of the administrative hierarchy.

"If, on the the other hand, he can show not only that his property has been over-assessed, but also that it was over-assessed as a result of one or more of the types of improper administrative action discussed above, he may well be able to get relief from the courts upon a showing of a comparatively small over-assessment."

One of respondent's experts testified it was difficult to appraise the property in question for the reason that there had been no sales of similar buildings in Seattle since 1928, that there is no problem in any type of real estate that would be more a matter of personal opinion than a large office building, and that honest and sincere appraisers might differ in their opinions as to the value of a large office building like the one in controversy.

The court cannot say, if mindful of the difficulty in appraisal of the Dexter Horton building under the conditions obtaining, that by clear and convincing evidence respondent has shown that the valuation is so excessive as to constitute constructive fraud. At most, all that can be said is that the evidence discloses only differences in opinion between appraisers, which we have never held sufficient ground for the interference by a court with the taxing officials.

"As we have seen, mere excess in valuation, in the opinion of the court, unless it furnishes conclusive presumption of fraud, does not authorize the interference of the court. Courts cannot convert themselves into assessors for purposes of taxation, and reassess in every case where the assessor has erred in his judgment as to the value of the property." *Templeton v. Pierce County,* 25 Wash. 377, 65 Pac. 553. See, also, *Adams County v. Northern Pac. R. Co.,* 115 F. (2d) 768; *Baker Inv. Co. v. Pierce County,* 175 Wash. 669, 27 P. (2d) 1092.

*Great Northern R. Co. v. Weeks,* 297 U. S. 135, 80 L. Ed. 532, 56 S. Ct. 426, to the effect that a small overvaluation may constitute constructive fraud, is not binding on this court, is not in harmony with our decisions, and is, in effect, repudiated by more recent opinions of the United States supreme court.

The error in the opinion in the case just cited is emphasized in the dissent in which attention is called

to the fact that the feature of the decision, which is especially a matter of concern, is that for the first time the court is setting aside a tax as a violation of the fourteenth amendment on the ground that the assessment on which it is computed is too high, without any showing that the assessment is discriminatory or that the petitioner was in any way bearing an undue share of the tax burden imposed on all property owners in the state.

In *Railroad Commission v. Rowan & Nichols Oil Co.*, 310 U. S. 573, 84 L. Ed. 1368, 60 S. Ct. 1021, the supreme court of the United States used the following language respecting the function of the court in reviewing the finding of an administrative body such as the railroad commission of Texas:

"Whether, as contended by the respondent, the maximum figure set by the Commission is too high in that it leads to the capture of oil from beneath its leases by neighboring operators, and whether a lower limit might suffice to assure profitable production—these questions take us into that debatable territory which it is not the province of federal courts to enter. The record is redolent with familiar dogmatic assertions by experts equally confident of contradictory contentions. These touch matters of geography and geology and physics and engineering. No less is there conflict in the evidence as to the solidity of respondent's apprehension that there will be drainage of oil beneath its surface by neighboring wells. The Commission's experts insist that the threat, if existent at all, is speculative, and that the Commission's power of continuous oversight is readily available for relief if real danger should arise in the future.

"Plainly these are not issues for our arbitrament. The state was confronted with its general problem of proration and with the special relation to it of the small tracts in the particular configuration of the East Texas field. It has chosen to meet these problems through the day-to-day exertions of a body specially entrusted with the task because presumably competent to deal

with it. In striking the balances that have to be struck with the complicated and subtle factors that must enter into such judgments, the Commission has observed established procedure. If the history of proration is any guide, the present order is but one more item in a continuous series of adjustments. It is not for the federal courts to supplant the Commission's judgment even in the face of convincing proof that a different result would have been better."

See, also, *Railroad Commission v. Rowan & Nichols Oil Co.*, 311 U. S. 570, 61 S. Ct. 343, in which the supreme court of the United States said:

"The justification for the Commission's order was its conviction that the minimum allowance accelerates the rate of production of the densely drilled areas on the edges of the field most subject to losses from the migration of the oil, that such allowance is an appropriate incentive to the drilling of small tracts, and that thereby investment losses in low-producing wells are minimized.

"Nothing in the Constitution warrants a rejection of these expert conclusions. Nor, on the basis of intrinsic skills and equipment, are the federal courts qualified to set their independent judgment on such matters against that of the chosen state authorities. For its own good reasons Texas vested authority over these difficult and delicate problems in its Railroad Commission. Presumably that body, as the permanent representative of the state's regulatory relation to the oil industry equipped to deal with its ever-changing aspects, possesses an insight and aptitude which can hardly be matched by judges who are called upon to intervene at fitful intervals. Indeed, we are asked to sustain the district court's decree as though it derived from an ordinary litigation that had its origin in that court, and as though Texas had not an expert Commission which already had canvassed and determined the very issues on which the court formed its own judgment. For it appears that the court below nullified the Commission's action without even having the record of the Commission before it. When we consider the limiting conditions of litigation—the adaptability

of the judicial process only to issues definitely circumscribed and susceptible of being judged by the techniques and criteria within the special competence of lawyers—it is clear that the Due Process Clause does not require the feel of the expert to be supplanted by an independent view of judges on the conflicting testimony and prophesies and impressions of expert witnesses."

Under the facts in the case at bar, as the action is one based purely on over-valuation, relief must be denied. The judgment is reversed on the county's appeal and affirmed as to the cross-appeal of plaintiff.

ROBINSON, C. J., JEFFERS, BEALS, and SIMPSON, JJ., concur.

