RAILROAD COMMISSION OF TEXAS ET AL. *v.*
ROWAN & NICHOLS OIL CO.

No. 218. Argued December 12, 13, 1940.—Decided January 6, 1941.

Mr. *James P. Hart,* Assistant Attorney General of
Texas, with whom *Messrs. Gerald C. Mann,* Attorney
General, *Edgar W. Cale, Tom D. Rowell, Jr.,* and *E. R.
Simmons,* Assistant Attorneys General, were on the brief,
for appellants.

Mr. *Dan Moody,* with whom *Mr. Rice M. Tilley* was
on the brief, for appellee.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

In conformity with the regulatory scheme devised by Texas for exploiting and safeguarding its oil resources, the Railroad Commission of that state in 1938 issued an order formulating a method for distributing among well owners the total amount of oil which it then allowed to

be produced in the East Texas field. The enforcement of this order was enjoined by lower federal courts at the suit of the complainant in the present case, Rowan & Nichols Oil Company, 28 F. Supp. 131; 107 F. 2d 70. To avoid the dislocation resulting from this judicial frustration of its order, the Commission, by an order of September 11, 1939, had to devise a new plan of proration. Its action in doing so was again promptly challenged in a federal district court in Texas. A decree enjoining the Commission followed, and an appeal from that decree is the matter now before us. Judicial Code, §§ 238, 266, as amended, 28 U. S. C. §§ 345, 380.

The challenged order of the Commission concededly satisfies all procedural requirements. It was part of a continuous process of administrative responsibility, preceded by a specific hearing affecting the immediate situation, with full opportunity given to the Oil Company to develop the facts and arguments which it later renewed below and here.

The Commission's action now in controversy cannot be severed from the earlier order which it replaced. Both set limits, incontestably valid, *Champlin Rfg. Co.* v. *Commission,* 286 U. S. 210, on the daily production of the East Texas field. In both litigations the Oil Company claimed to be a victim of illegalities in the method of distributing this total allowable production among the different classes of oil producers.

So far as relief in the federal courts is concerned, we found in the prior phase of this continuing litigation that the order of the Commission was without infirmity. 310 U. S. 573; *post,* p. 614. In the order which was then before us each well was allowed 2.32 per cent of its hourly potential production, except that wells not capable of producing 20 barrels a day at open flow were, in conformity with the Marginal Well Statute (Vernon's Texas Annotated Civil Statutes, art. 6049b), allowed full capacity,

and wells which could not produce over 20 barrels a day at 2.32 per cent of their hourly potential were allowed 20 barrels a day. The order distributed, in round numbers, a total allowable of 522,000 barrels as follows: 5,250 a day to 451 wells having a capacity of less than 20 barrels; 380,640 to 19,032 wells which at 2.32 per cent of hourly potential could not produce over 20 barrels; 136,610 to 6,325 wells at the rate of 2.32 per cent of hourly potential. This adjustment by the state's expert agency of what in our former opinion we called "as thorny a problem as has challenged the ingenuity and wisdom of legislatures" was attacked on two grounds. It was claimed that an hourly potential formula fatally omitted other relevant factors, especially acre-feet of sand. Further it was urged that the minimum allowance of 20 barrels, which nearly absorbed the total production, constituted an illegitimate discrimination against high-producing and thinly drilled areas. We rejected these arguments as an attempt to substitute a judicial judgment for the expert process invented by the state in a field so peculiarly dependent on specialized judgment. We said in effect that the basis of present knowledge touching proration was so uncertain and developing, that sounder foundations are only to be achieved through the fruitful empiricism of a continuous administrative process. Further, that ought not to be stifled by drawing from the generalities of the Constitution allegiance to one as against another speculative assumption even though delusively clothed in formal findings of fact.

In the order now before us the Commission allowed a total production of 691,000 barrels, and the formula of allocation took into consideration two other factors—bottomhole pressure and the quality of the surrounding sand of the wells—as well as hourly potential. By this formula 514 wells incapable of producing 20 barrels a day at open flow absorbed 6,245 barrels, 25,456 wells were

allotted a minimum of 20 barrels, thus absorbing 509,000 barrels, leaving 176,000 barrels to be distributed among these latter wells according to the new allocation formula. Under the first order, the minimum per well allowance of 20 barrels accounted for 98 per cent of the limited production; under the later order only 75 per cent was needed to satisfy the 20 barrel allowance. The lease involved in this litigation was allowed by the first order an output of 154 barrels a day, or .029 per cent of the total allowable; now it may produce 260 barrels a day, which is .037 per cent of the total. This comparison of the practical operation of the two orders exposes the emptiness of the claim that a constitutional line can be drawn between them.

The accommodation of conflicting private interests in the East Texas oil field, with due regard to the public welfare, is beset with perplexities, both geological and economic. As we read the records in these cases, this picture emerges. The huge oil resources of that region, viewed in cross-section from east to west, are roughly triangular in shape. On the lower western side the pressure of an oil-water face furnishes the principal energy of the field. As the oil is withdrawn, the pressure is decreased. The drive of the water from the west forces the oil eastward, and the westernmost wells are first exhausted. The reduced pressure in the field shortens the life of the wells on the extreme eastern edge, with the result that the wells nearer the center of the field, like those of the Rowan & Nichols Company, are likely to be most long-lived. Thus it is that a production formula dependent on current reserves of oil in place—a consideration which greatly influenced the court below and was urged before us—contains elements of unfairness to wells on the edge of the field by disregarding the migration of oil from west to east. Other factors further complicate the situation. The surface is often divided into

small tracts, and the Commission, acting under the authority of the Texas statutes, has permitted the drilling of wells by small owners in order to prevent practical forfeiture of their interests. Small producers have investments in existing wells with low capacities, and these wells need a minimum daily production sufficient to justify their enterprise. In addition to all this, any scheme of proration duly mindful of all those considerations, hardly mathematically commensurable, which constitute the total well-being of a society, must assure the continued operation of a sufficient number of wells for an adequate exploitation of the state's oil resources.

In achieving a reconciliation of these tangled and partly conflicting aims, the Commission evidently regarded the 20 barrel minimum allowance as a guiding factor, taking its cue doubtless in part from the policy underlying the Texas Marginal Well Statute, *supra*. The justification for the Commission's order was its conviction that the minimum allowance accelerates the rate of production of the densely drilled areas on the edges of the field most subject to losses from the migration of the oil, that such allowance is an appropriate incentive to the drilling of small tracts, and that thereby investment losses in low-producing wells are minimized.

Nothing in the Constitution warrants a rejection of these expert conclusions. Nor, on the basis of intrinsic skills and equipment, are the federal courts qualified to set their independent judgment on such matters against that of the chosen state authorities. For its own good reasons Texas vested authority over these difficult and delicate problems in its Railroad Commission. Presumably that body, as the permanent representative of the state's regulatory relation to the oil industry equipped to deal with its ever-changing aspects, possesses an insight and aptitude which can hardly be matched by judges who are called upon to intervene at fitful intervals.

Indeed, we are asked to sustain the district court's decree as though it derived from an ordinary litigation that had its origin in that court, and as though Texas had not an expert Commission which already had canvassed and determined the very issues on which the court formed its own judgment. For it appears that the court below nullified the Commission's action without even having the record of the Commission before it. When we consider the limiting conditions of litigation—the adaptability of the judicial process only to issues definitely circumscribed and susceptible of being judged by the techniques and criteria within the special competence of lawyers—it is clear that the Due Process Clause does not require the feel of the expert to be supplanted by an independent view of judges on the conflicting testimony and prophesies and impressions of expert witnesses.

This record gives little justification for confidence in such testimony as the basis for judicial dogmatism. Take, for instance, the question of the amount of recoverable oil remaining in the field. One expert testifying for the Company in this case gave an estimate of 3,180,-000,000 barrels, while in another case a year previously his estimate had been a billion barrels less. Similarly, in regard to the crucial issue of the 20 barrel minimum, although it was common ground that some minimum was essential to avoid fatal losses of investment, what that minimum should be was clearly not shown to be capable of mathematical ascertainment, and no expert on behalf of the Oil Company proved that the minimum of the Commission bore no relation to the legislative policy to be enforced by the Commission.

The Constitution does not provide that the federal courts shall strike a balance between ascertainable facts and dubious inferences underlying such a complicated and elusive situation as is presented by the Texas oil fields in order to substitute the court's wisdom for that

of the legislative body. *Standard Oil Co. v. Marysville,* 279 U. S. 582. The real answer to any claims of inequity or to any need of adjustment to shifting circumstances is the continuing supervisory power of the expert commission. In any event, a state's interest in the conservation and exploitation of a primary natural resource is not to be achieved through assumption by the federal courts of powers plainly outside their province and no less plainly beyond their special competence. The Fourteenth Amendment was not intended for such ends.

The court below also erred in holding the order a violation of the Texas statute requiring proration on a "reasonable basis." Vernon's Texas Annotated Civil Statutes, art. 6049c, § 7. In denying the petition for rehearing in the earlier cases we held that whatever rights the state statute may afford are to be pursued in the state courts, *post,* p. 614.

The decree is vacated and the case is remanded to the district court for dismissal of the complaint.

*Vacated.*

The CHIEF JUSTICE, MR. JUSTICE MCREYNOLDS, and MR. JUSTICE ROBERTS dissent for the reasons stated in the dissenting opinion in *Railroad Commission of Texas* v. *Rowan & Nichols Oil Co.,* 310 U. S. 573. They are of opinion that the facts disclosed by the record do not differ materially from those found in the earlier case and require the affirmance of the judgment.