## FILBURN v. HELKE et al.
### No. 118.

District Court, S. D. Ohio, W. D.

March 14, 1942.

Webb R. Clark and Harry N. Routzohn, both of Dayton, Ohio, for plaintiff.

Calvin Crawford, U. S. Atty., of Dayton, Ohio, and John S. L. Yost and W. Carroll Hunter, Sp. Assts. to the Atty. Gen., for defendants.

Before ALLEN, Circuit Judge, and NEVIN and DRUFFEL, District Judges.

DRUFFEL, District Judge.

The above entitled action was submitted to this three judge court organized under Section 3 of the Act of August 24, 1937, 28 U.S.C.A. § 380a, after argument, upon the pleadings and agreed stipulation of facts from which it appears that plaintiff is a farmer who has been engaged in producing wheat among other products on a farm in Montgomery County, Ohio. Under the provisions of the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C.A. § 1281 et seq., a wheat acreage allotment of 11.1 acres and a normal yield of 20.1 bushels an acre were established for plaintiff's farm in July, 1940, for the 1941 wheat crop.

In the fall of 1940 plaintiff planted 23 acres of wheat which produced in July, 1941, 462 bushels, which amounted to 239 bushels farm marketing excess over the fixed allotment. At the time of planting the acreage in excess of the allotment, Section 339 of the Act provided: "Any farmer who, while farm marketing quotas are in effect, markets wheat in excess of the farm marketing quota for the farm on which such wheat was produced, shall be subject to a penalty of 15 cents per bushel of the excess so marketed."

In due time, the defendant Claude R. Wickard, Secretary of Agriculture, pursuant to the Act, issued a proclamation relating to the national marketing quota, at the same time calling for a national referendum on May 31, 1941, of wheat farmers planting more than fifteen acres of wheat (fifteen acres or less are exempt from the Act) to approve or disapprove of the quota allotment, etc., and also issued instructions as to the referendum.

On May 19, 1941, Mr. Wickard made a radio address to the farmers of the United States, in which he strongly urged an affirmative vote of more than the necessary

two-thirds of eligible wheat farmers in the national referendum, saying among other things:

" * * * To make wise decisions, we need to know the facts. What then, in view of the vote on May 31, are some of the facts about wheat? For one thing, we have a record amount of old wheat on hand and a bumper crop in prospect. That is something to be looked at with satisfaction on one hand and with alarm on the other. * * * Because of the uncertain world situation, we deliberately planted several million extra acres of wheat this year. * * * Farmers should not be penalized because they have provided insurance against shortages of food. The nation wants farmers safeguarded against unfair penalties. The nation also wants other protection given agriculture. * * * As you all know, parity is one of the most important objectives of the national farm programs and will continue to be a goal, * * *

"Only last week, the Senate and House sent to the White House a bill calling for an 85 percent of parity loan for wheat * * *

"But no wheat loan will be made unless wheat farmers vote for marketing quotas and without the loan there is no hope for parity on wheat in 1941. So parity for wheat is up to the wheat farmers themselves. * * * .

"The law provides that wheat loans will not be made if wheat growers vote down marketing quotas. * * * The continuance—or discontinuance—of government loans on wheat is at stake in this referendum on May 31. To put it bluntly, no quotas, no loans. And, judging from prices in Canada, rejection of marketing quotas on May 31 would just about cut the price of wheat in this country in half. * * *

"I wish that corn and wheat farmers were able to vote on marketing quotas before they plant their crops, instead of afterwards as is the case now. Cotton, tobacco, and rice farmers vote on quotas before they plant and I see no good reason for denying this privilege to wheat and corn growers. I am sorry that the legislation authorizing loans at 85 percent of parity did not change the time for voting on wheat and corn quotas. This provision was recommended by the Department of Agriculture and we plan to recommend it to Congress again. Yet the fact that the referendum on wheat quotas comes after the crop is almost ready for harvest in no way alters the significance of the vote." * * *

In the national referendum 81% voted in favor of the marketing quotas and 19% were opposed to the quotas.

On May 26, 1941, the bill referred to by Mr. Wickard, relating to wheat marketing quotas under the Act of 1938, as amended, was approved. The Act as thus amended provided for an increase in loans on wheat equal to 85% of the parity price of wheat. It also provided during any marketing year the quotas are in effect, the producer shall be subject to a penalty on the farm marketing excess at the rate of one-half of the basic rate of the loan on the commodity, and that the entire crop of wheat produced on the farm shall be subject to a lien in favor of the United States for the amount of the penalty.

Plaintiff for his cause of action complains that the excess of 239 bushels of wheat has been subjected to a penalty of 49 cents per bushel by the defendant county committee; that his entire crop of wheat is subject to a lien for the payment thereof, and unless paid he would be refused a marketing card, which is necessary for plaintiff to sell his crop of wheat.

By reason thereof plaintiff challenges the authority of the Secretary of Agriculture to construe said Act, as amended, retroactively as to the crop of wheat planted in the fall of 1940, and asserts that the referendum is invalid and the Act and amendments thereto are violative of Sections 4 and 9 of Article I of the Constitution and of the Fifth and Tenth Amendments thereto.

In the recent case of Mulford et al. v. Smith et al., 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092, the Supreme Court considered questions relating to the claimed retroactive operation of the Tobacco Act, 7 U.S.C.A. § 1311 et seq., and upheld the Act.

Upon analysis we believe the case at bar is clearly distinguishable from Mulford et al. v. Smith et al., aside from the difference in controlling provisions of the Wheat and Tobacco Acts, and should be placed in an entirely different category because of the circumstances surrounding the referendum and the fact that the law increasing the penalty was approved only five days prior to the national referendum held in forty wheat growing states.

Considering the fact that the law increasing the penalty to one-half of the 85% par-

ity loan and subjecting the entire wheat crop to a lien for the payment thereof became effective May 26, 1941, yet would be inoperative if more than one-third of the eligible wheat farmers opposed the quota in the May 31st referendum, it becomes important to determine whether or not the necessary two-thirds of the wheat farmers voluntarily voted affirmatively or were unintentionally misled in so voting in the referendum.

It is fully recognized by all that Congress has devoted much time in the past several years in a laudable effort to help the farmers, and as Mr. Wickard said: "parity is one of the most important objectives of the national farm programs and will continue to be a goal," and it is but natural that the several hundred thousands of wheat farmers, scattered all over the United States (559,630 voted), should look to the Secretary of Agriculture for advice and direction in a matter of such importance as the quota referendum, and when in his official capacity, the Secretary, in the nation-wide radio speech appealing for an affirmative vote for the quota, eleven days prior to the referendum, said: * * * "To make wise decisions, we need to know the facts. * * * Because of the uncertain world situation, we deliberately planted several million extra acres of wheat. * * * Farmers should not be penalized because they have provided insurance against shortages of food," it would seem that the Secretary meant what he said and that the farmers voting affirmatively would not be penalized for the "deliberately planted" excess acreage beyond the law in effect at the time of planting. But the contrary was true, the bill to which Mr. Wickard referred greatly increased the penalty for the "deliberately planted" excess acreage and subjected the entire crop to a lien for the payment of the penalty.

Giving full credit to the Secretary for his zeal and his efforts to help the farmer to avoid ruinous wheat prices which he foresaw if the quota referendum failed, yet it would seem that the equities of the situation demanded that the Secretary also forewarn the farmers that in accepting the benefits of increased parity loans they were also subjecting themselves to increased penalties for the farm marketing excess.

In the Mulford et al. v. Smith et al., case, 307 U.S. 38, 46, and 47, 59 S.Ct. 648, 651, 83 L.Ed. 1092, the court say: "In the light of the fact that the appellants received no-

tice of their quotas only a few days before the actual marketing season opened, the maintenance of actions based upon collection of the penalties would have been a practical impossibility. We are of opinion, therefore, that a case is stated for the interposition of a court of equity." Here but five days intervened between the time the law became effective and the favorable referendum which made it operable.

We have no precedent in point to guide us in a determination of the precise issues raised by the foregoing state of facts. However, in cases involving the validity of gift taxes a principle was approved which we think applicable here. The Supreme Court in Nichols v. Coolidge, 274 U.S. 531, 542, 47 S.Ct. 710, 714, 71 L.Ed. 1184, 52 A.L.R. 1081, say: "This court has recognized that a statute purporting to tax may be so arbitrary and capricious as to amount to confiscation and offend the Fifth Amendment" and in Welch v. Henry, 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87, 118 A.L.R. 1142, say: "In the cases in which this Court has held invalid the taxation of gifts made and completely vested before the enactment of the taxing statute, decision was rested on the ground that the nature or amount of the tax could not reasonably have been anticipated by the taxpayer at the time of the particular voluntary act which the statute later made the taxable event." (The voluntary act in the case at bar being the affirmative vote in the referendum.)

■■ Under the circumstances we are obliged to hold that the amendment of May 26, 1941, 7 U.S.C.A. §§ 1330, 1340, in so far as it increased the penalty for the farm marketing excess over the fifteen cents per bushel prevailing at the time of planting and subjected the entire crop to a lien for the payment thereof, operated retroactively and that it amounts to a taking of plaintiff's property without due process, and also, or in the alternative, that the equities of the case as shown by the record favor the plaintiff.

In consideration whereof the court grants plaintiff's prayer to the extent that defendants be perpetually enjoined from collecting the penalty for the farm marketing excess over and above fifteen cents per bushel and from subjecting the entire crop to a lien for the payment thereof and from collecting said fifteen cents per bushel except in accordance with the provisions of Section 339 of the Agricultural Adjustment Act of

1020

1938 as it was in effect prior to May 26, 1941.

In view of the foregoing we deem it unnecessary to pass on the other questions raised by plaintiff's bill of complaint. Brucker v. Fisher, 6 Cir., 49 F.2d 759–761; Piedmont & N. R. Co. v. Query, D.C., 56 F.2d 172–175.

NEVIN, District Judge, concurs.

ALLEN, Circuit Judge (dissenting).

I cannot agree with the conclusions of my colleagues. There is no equitable justification for interference by this court with the fulfillment of the declared legislative will of the nation because of the circumstances under which a marketing excess of wheat was established for plaintiff's farm.

The question of the legal effect of alleged infirmities in the referendum on quota provisions for the 1941 crop of wheat is substantially identical in every material respect with that considered by the Supreme Court in United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S. Ct. 993, 83 L.Ed. 1446. That case held that an order issued by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act, 7 U.S.C.A. § 601 et seq., was valid and enforceable. The order fixed minimum prices to be paid producers for milk sold to dealers and disposed of by them in a designated market area comprising the city of New York and adjacent counties. Just as here, a favorable referendum of farmers was made a condition upon the operation and effectiveness of wheat marketing quotas, so in that case the Marketing Agreement Act required that an order fixing prices to the producers should be made only on condition that such provision was "approved or favored" by a specific proportion of the producers of the milk covered in such order. Title 7, U.S.C. § 608c (9) (B). There a pamphlet issued by the Department of Agriculture prior to the referendum and publications of private organizations contained statements to the effect that dealers would be required to pay all producers the uniform price established, whereas the order made it clear that the uniform price was not applicable to milk sold outside the market area or to milk handled by cooperatives. The Supreme Court held that the validity of the referendum had not been affected.

Here the alleged misrepresentation claimed to have vitiated the submission of the wheat quota referendum is extracted from a radio speech of the Secretary of Agriculture made some twelve days before the referendum. He said that "farmers should not be penalized because they have provided insurance against shortages of food." The plaintiff claims this language is misleading because of the provision in the amendment to the Act which increased the penalty on the farm marketing excess from 15 to 49 cents per bushel. The context of the Secretary's speech makes it clear that he was speaking of penalties in the form of ruinously low prices which result from an excess supply of any basic farm commodity. No reference to enforcement provisions of any legislation, new or old, could reasonably be understood to be intended from the reference to low prices as penalties, for the Secretary went on to say:

"The nation also wants other protection given agriculture. One expression of this wish is the national farm programs. These programs protect all farmers. Since the second world war began, commodity loans have stood between wheat producers and the economic blitzkrieg.

"Without the programs, wheat prices would be threatening the low record of 1932 instead of being within striking distance of parity as they are now."

Other statements significant of the intended emphasis are as follows:

"Average prices of wheat to Kansas growers in mid-May were about 80 cents. This compares with about 45 cents to Canadian farmers (United States money). Leaving out government payments, American producers will receive over twice as much for this year's wheat as Canadian growers."

"High prices without adjustment of supply are certain to be followed by ruinously low prices. We know that from experience."

It is not claimed that the speech was intended to mislead producers, and considered as a whole, it would not have a natural tendency to mislead. As in United States v. Rock Royal Co-operative, Inc., supra [307 U.S. 533, 59 S.Ct. 1006, 83 L.Ed. 1446], "there is no evidence that any producer misunderstood." The Secretary declared as a fact and it is not denied that the requisite proportion of the participants voted in favor of the institution of quotas. In

the language of the Supreme Court, "There is no authority in the courts to go behind this conclusion of the Secretary to inquire into the influences which caused the producers to favor" the proposed action. United States v. Rock Royal Co-operative, Inc., supra.

While the plaintiff presents a case of possible hardship, I do not think that the penalty provisions operate so retroactively or so arbitrarily as to violate the Fifth Amendment.

In Mulford v. Smith, 307 U.S. 38, 59 S. Ct. 648, 83 L.Ed. 1092, the crop of tobacco, which was subjected to a penalty insofar as it exceeded certain quotas and was marketed, had been planted in seed beds before the Act was passed, had matured and was ready for marketing before producers received notice of the quota allotted to their respective farms. In that case it was claimed that since the producers complaining were unable to process their tobacco and make it fit to be held for sale in a later year, the penalty amounted to a tax upon production and was so oppressive as to be invalid. The Supreme Court held that the fact that certain producers had not provided facilities for processing and storing the excess tobacco was of no legal significance.

The distinctions which the plaintiff advances do not distinguish the Mulford case. The plaintiff complains that his entire crop of wheat is now subject to a lien in favor of the United States for the amount of the penalty. The assertion is made that "Wheat farmers, under the provisions of the Act as amended on May 26, 1941, are denied the privilege of storing their wheat, any part of it, without paying the penalty of 49 cents a bushel on all of the excess production." This statement is misleading. It is true only if storing is given the meaning of "storing without compliance with the Act," for the resolution adopted May 26, 1941, Public Law 74–77th Congress expressly provides, paragraph 4: "Until the producers on any farm *store*, deliver to the Secretary, or pay the penalty on, the farm marketing excess of any crop of corn or wheat, the entire crop of corn or wheat, as the case may be, produced on the farm shall be subject to a lien in favor of the United States for the amount of the penalty." (Italics added.) 55 Stat. 204.

This clearly means that the lien and the penalty may be avoided by storage of the excess. This conclusion is reenforced by paragraph 6 of the same amendment, which reads: "Whenever the planted acreage of the then current crop of corn or wheat on any farm is less than the farm acreage allotment for such commodity, the total amount of the commodity from any previous crops required to be stored in order to postpone or avoid payment of penalty shall be reduced by that amount which is equal to the normal production of the number of acres by which the farm acreage allotment exceeds the planted acreage. The provisions of section 326(b) and (c) of the Act shall be applicable also to wheat."

Penalties, therefore, may be avoided by planting acreage below the allotment for a later year or by yields in a subsequent year which are below normal either for the particular farm or for the nation as a whole. Title 7, U.S.C.A. § 1326 (b) and (c).

The Act does not purport to control production, but only sale or use. It had been passed some two and a half years before the plaintiff's crop was planted, and it is stipulated that plaintiff had notice of his farm acreage allotment in July, 1940, before the planting of his 1941 crop of wheat. An exaction is not necessarily unconstitutional because retroactive. Milliken v. United States, 283 U.S. 15, 21, 51 S.Ct. 324, 75 L.Ed. 809. "In each case it is necessary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation." Welch v. Henry, 305 U.S. 134, 147, 59 S.Ct. 121, 126, 83 L.Ed. 87, 118 A.L.R. 1142. It is not so harsh or oppressive here. While the monetary value of plaintiff's wheat crop has been so increased by the stimulating affect of the Act upon wheat prices that the increased price more than compensates for any penalty that plaintiff may be required to pay, it is even more significant that plaintiff was informed that Congress had undertaken to regulate the supply of wheat available for market by the imposition of penalties. Milliken v. United States, supra. The Act had been amended in material respects before plaintiff planted his wheat in the fall of 1940, and he could reasonably anticipate that Congress would make further amendments if they were deemed advisable. One amendment previously made showed that Congress intended to make whatever changes were appropriate to avoid circumvention of the basic purposes of the Act, for it had

expanded the meaning of "market" so as to include in the case of wheat, feeding to poultry or livestock. 54 Stat. 727, Sec. 3, approved July 2, 1940, 7 U.S.C.A. § 1301.

Congress may impose penalties in aid of the exercise of any of its granted powers. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 393, 60 S.Ct. 907, 84 L. Ed. 1263. The authority of the Federal Government over interstate commerce does not differ in extent or character from that retained by the states over matters within their jurisdiction. United States v. Rock Royal Co-operative, Inc., supra, 307 U.S. at pages 569, 570, 59 S.Ct. 993, 83 L.Ed. 1446. If the commerce clause is a sufficient source of power, controls adopted in its exercise are unconstitutional "only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." Nebbia v. New York, 291 U.S. 502, 539, 54 S.Ct. 505, 517, 78 L.Ed. 940, 89 A.L.R. 1469. Here the classification of wheat subject to penalty and wheat free from penalty is an "integral and essential feature" of the Act. Adequate administrative procedure with court review has been provided to insure fair allocation of quotas. Cf. Railroad Commission of Texas v. Rowan & Nichols Oil Co., 310 U. S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368; Id., 311 U.S. 614, 61 S.Ct. 66, 85 L.Ed. 390; Id., 311 U.S. 570, 61 S.Ct. 343, 85 L.Ed. 358. Discrimination between cooperating and non-cooperating producers is a constitutional means of securing compliance. " * * * the Fifth Amendment, unlike the Fourteenth, has no equal protection clause." Sunshine Anthracite Coal Co. v. Adkins, supra, 310 U.S. at page 401, 60 S.Ct. at page 916, 84 L.Ed. 1263.

The Act as applied to wheat is a valid exercise of the federal commerce power. The tobacco marketing quota provisions have been so upheld. Mulford v. Smith, supra. A like decision has been reached as to the provisions relating to cotton. Troppy v. La Sara Farmers Gin Co., Inc., 5 Cir., 113 F.2d 350. Denial of the same validity to wheat regulation, as a regulation of interstate and foreign commerce, as has been accorded to the tobacco and cotton regulations of the Act, would result in an incongruous exercise of the federal commerce power.

It is no longer open to question that Congress has the power to protect interstate commerce "from interference or injury due to activities which are wholly intrastate." National Labor Relations Board v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 671, 83 L.Ed. 1014. "Activities conducted within state lines do not by this fact alone escape the sweep of the Commerce Clause. Interstate commerce may be dependent upon them." United States v. Rock Royal Co-operative, Inc., supra, 307 U.S. at page 569, 59 S.Ct. at page 1011, 83 L.Ed. 1446.

It is true that Congress has no power to regulate intrastate transactions which affect commerce only indirectly. A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. But where it is claimed that the local activity sought to be regulated does not directly affect commerce, decision should not be made by examination of the effect of isolated individual activity, but must include due regard to the total effect of the attempted regulation. United States v. Darby, 312 U.S. 100, 123, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

Title 7, U.S.C.A. § 1331, reads as follows:

"Wheat is a basic source of food for the Nation, is produced throughout the United States by more than a million farmers, is sold on the country-wide market and, as wheat or flour, flows almost entirely through instrumentalities of interstate and foreign commerce from producers to consumers.

"Abnormally excessive and abnormally deficient supplies of wheat on the country-wide market acutely and directly affect, burden, and obstruct interstate and foreign commerce. Abnormally excessive supplies overtax the facilities of interstate and foreign transportation, congest terminal markets and milling centers in the flow of wheat from producers to consumers, depress the price of wheat in interstate and foreign commerce, and otherwise disrupt the orderly marketing of such commodity in such commerce. Abnormally deficient supplies result in an inadequate flow of wheat and its products in interstate and foreign commerce with consequent injurious effects to the instrumentalities of such commerce and with excessive increases in the prices of wheat and its products in interstate and foreign commerce.

* * * * * *

"The conditions affecting the production and marketing of wheat are such that, with-

out Federal assistance, farmers, individually or in cooperation, cannot effectively prevent the recurrence of such surpluses and shortages and the burdens on interstate and foreign commerce resulting therefrom, maintain normal supplies of wheat, or provide for the orderly marketing thereof in interstate and foreign commerce.

" * * * The provisions hereof for regulation of marketings by producers of wheat whenever an abnormally excessive supply of such commodity exists are necessary in order to maintain an orderly flow of wheat in interstate and foreign commerce under such conditions."

The stipulation of facts now before us amply supports these legislative findings. It follows that regulation of the supply of wheat that normally moves in interstate or foreign commerce must be upheld as an appropriate means reasonably adapted to the regulation of interstate commerce. Since regulation of the supply of wheat available for sale in interstate commerce but actually used within the state of its origin is drawn into a general plan for the protection of interstate commerce in the commodity from the interferences, burdens and obstructions arising from excessive surplus and the social evils of low values, the power of Congress extends to it as well. United States v. Rock Royal Co-operative, Inc., supra, 307 U.S. at page 569, 59 S.Ct. 993, 83 L.Ed. 1446. The regulation of prices there upheld had no more direct or substantial relation to the flow of goods in interstate commerce than does control of supply. The local activities regulated not only affect interstate commerce but also affect the exercise of the granted power of Congress to regulate interstate commerce in sufficient measure that such regulation is an appropriate and hence permissible means of attaining that legitimate end. See United States v. Darby, supra, 312 U.S. at page 118, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

The bill of complaint should be dismissed.