ATLANTIC CITY SEWERAGE COMPANY, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, DEFENDANT.

CITY OF ATLANTIC CITY, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND ATLANTIC CITY SEWERAGE COMPANY, DEFENDANTS.

Argued October 8, 1941—Decided May 5, 1942.

Before BROGAN, CHIEF JUSTICE, and Justice HEHER.

For the Atlantic City Sewerage Company, *Autenrieth & Worlendyke* and *Thompson & Lloyd (Joseph F. Autenrieth,* of counsel.

For the City of Atlantic City, *Samuel Backer*.

For the Board of Public Utility Commissioners, *John A. Bernhard* (*Frank H. Sommer*, of counsel).

The opinion of the court was delivered by

HEHER, J.   The Atlantic City Sewerage Company and the City of Atlantic City have sued out cross-writs of *certiorari* to review the judgment of the Board of Public Utility Commissioners disapproving a proposed schedule of charges for the Company's various services and directing the submission of a revised schedule "so designed as to produce on the basis of present billing data, together with reasonable charges for air conditioning and refrigeration service, an increase of not more than $28,000 in annual operating revenue." The determination was predicated on findings that the fair rate base as of October 31st, 1940, including the "estimated expenditures subsequent to that date necessary to complete" a chlorination plant demanded by the State Board of Health, was $2,500,000; that the Company "is entitled to earn" thereon "at the rate of 6 per cent., or $150,000 per annum;" that the "estimated annual return" under the pre-existing rates, less adjusted operating expenses, chlorination expense, amortization of rate case expense, taxes and depreciation, is $129,716, or $20,284 less than is just and reasonable; that the Company is required to pay a franchise tax of 5% on operating revenue and a federal income tax of approximately 24% on net taxable income; and that therefore an increase in operating revenue of $28,013 is requisite to realize the prescribed additional return of $20,284.

It is the insistence of the Company that the proofs establish a rate base value of $3,000,000, entitling it "to an increase in rates in the sum of approximately $160,000, designed to be raised by its proposed schedule of rates," and that a lesser valuation for rate purposes would be confiscatory. The municipality, on the other hand, maintains that there is no rational basis in the evidence for a finding of a rate base in excess of $2,300,000, and that the rate increase granted by the Board is therefore arbitrary and illegal.

The company is a public utility as defined by *R. S.* 1937, 48:2-13. It was incorporated on December 28th, 1888, and has ever since rendered sewerage service in Atlantic City. This municipality comprises a group of irregularly-shaped sand islands. Its highest point is about six feet above high water; and in places tidewater is found at three to four feet below the surface. It is bounded by the Atlantic Ocean on the east; and a tidal channel known as the Beach Thoroughfare separates the islands from the mainland on the west. Its permanent population is approximately 70,000, but at times during the summer season it increases nearly to 500,000. Concededly, the physical conditions and the extraordinarily large fluctuation in population have given rise to constructional and operational difficulties. The original collecting system was designed to serve what is now the principal commercial and hotel section of the municipailty, located on the main island. It provided for a deep receiving well and pumping station at Baltic and Chalfonte Avenues. Sewage flowed by gravity to the pumping station, whence it was conveyed by pumps to filters on the meadows northwest of the city. In 1897 the disposal works were moved to City Island, where the Company's treatment plant is now established. The growth of the city required an expansion of the sewerage system; and the area now served is slightly less than three square miles. The facilities for the disposal of sewage in the Chelsea Heights section are owned by the City, but operated by the Company under a contract with the City. There is no physical connection between the two systems. There are four pumping stations, one in each of the four principal districts comprising the service area. Except during the summer season, all the sewage is treated at the City Island plant and then conveyed through twelve sedimentation tanks, whence the effluent is discharged into the Beach Thoroughfare. The sludge from the tanks is removed by pumps, dried, and devoted to the raising of the elevation of the surface of City Island. When the summer flow is beyond the capacity of the City Island facilities, the excess is treated at a pumping station situate on Texas Avenue, whence it is discharged into the Beach Thoroughfare. The Company's collecting system

includes 81 miles of pipe, chiefly terra-cotta, ranging in size from 6 to 66 inches. The mains are laid at depths varying from near the street surface to 14 feet. The force mains consist of approximately 7½ miles of cast-iron pipe, mostly class B, ranging in size from 10 to 36 inches in diameter. The number of service connections has increased from 1,849 in the year 1891, to 13,021 in the year 1940.

## I. *Valuation of Property:*

The Company submitted two valuation bases—(1) plant reproduction cost new less depreciation, amounting to approximately $3,400,000; and (2) book value in the sum of $3,060,000. These are termed "yardsticks designed to reflect the 'present value'" of the property as a rate base. The City's estimate of "reproduction cost new less depreciation" is condemned as grounded on "average prices" and an "excess in the depreciation reserve;" and the vice of the Board's valuation is asserted to be the acceptance of the original cost of the property without attempting "to trend" such "cost to reflect prevailing prices at the time of the inquiry."

We concur in the Board's appraisal of the property as the fair value base. Its own expert calculated the original cost of the property, less depreciation, at $2,075,985.49; and there is no reasonable basis in the proofs for a finding in excess of that sum. Although they were in substantial agreement as to the inventory, and there was a common assumption of reproduction cost in a two-year construction period, the Company's expert estimated the reproduction cost of the physical property on the basis of the prices prevailing "at the time of the inquiry," less depreciation, at $3,031,925, while the City's expert, using prices "current on October 31st, 1940," fixed it at $2,745,629. The former made an addition of $400,000 for "going value," or a "total reproduction cost new, depreciated as of the time of the inquiry," of $3,431,925. The latter considered $250,000 entirely ample for this item, or a total of $2,995,629. Such, it seems to be conceded, fairly represents the reproduction cost new, less depreciation, "at the time of the inquiry." But this witness deducted $290,000,

"due to the use of price levels higher than average price levels;" and this is assigned for error. The witness made a further deduction of $433,000, the difference between what he conceived to be the *quantum* of actual physical depreciation and the accrued reserve for depreciation entered on the Company's books. The Company's engineer estimated the depreciation at $998,819; the City's at $555,000. One of the Board's engineers, whose qualifications are unquestioned, fixed the original cost, less the adjusted depreciation reserve as of December 31st, 1939, at $1,923,070.04. He allowed necessary capital additions in the net sum of $152,915.45, or a total of $2,075,985.49.

Rate-making is essentially a legislative function; and the Board is empowered to fix a "just and reasonable individual" rate whenever it shall determine that the existing rate is "unjust, unreasonable, insufficient or unjustly discriminatory or preferential." *R. S.* 1937, 48:2-21. While there seems to be contrariety of opinion respecting the scope of the judicial review as respects the fulfillment of this statutory standard, we have deemed it to be our duty to weigh the evidence and resolve the issues of fact on the hypothesis that *R. S.* 48:2-46 and *R. S.* 2:81-8 are in *pari materia*. *Pennsylvania Railroad Co.* v. *Public Utility Commissioners,* 83 *N. J. L.* 67; *affirmed,* 84 *Id.* 619, 759, 762, 763, 764; *Interstate Telephone, &c., Co.* v. *Public Utility Board,* 84 *Id.* 184; *Public Service Gas Co.* v. *Public Utility Board,* 84 *Id.* 463; *affirmed,* 87 *Id.* 581; *Erie Railroad Co.* v. *Public Utility Board,* 85 *Id.* 420; *Public Service Railway Co.* v. *Board of Public Utility Commissioners,* 86 *Id.* 105; *affirmed,* 87 *Id.* 250; *New Jersey Suburban Water Co.* v. *Board of Public Utility Commissioners,* 123 *Id.* 303. See, also, *State* v. *Czarnicki,* 124 *Id.* 43; *Coles* v. *Blythe,* 69 *Id.* 666; *Ryer* v. *Turkel,* 75 *Id.* 677.

The experts were in disagreement as to price factors, the *quantum* of going value, and the allowance for depreciation; and it is clear that the Company's engineer indulged in certain speculative and unwarranted assumptions respecting construction needs and used excessive unit prices, limited also to the date of his appraisement. His premises rhyme ill with the realities. This is demonstrated by the evidence elicited from

expert witnesses familiar from actual experience with the peculiar conditions attending such construction work in the *locus* and the cost thereof. Moreover, his inventory and appraisement of the collecting system and force mains (aggregating 85% of the total cost of the property on either a book cost or reproduction cost basis) was founded on one made by another engineer in 1921. And it contained items which the Board properly found have no place in the calculation of the reproduction cost. And the witness assumed that the land was worth $118,213. There was no evidence whatever to sustain this valuation. *Per contra,* the City adduced evidence from realty experts fixing the value at approximately $32,000.

The valuation made by the City's engineer is challenged as erroneously based upon "average price levels" over the prior five year period rather than the "prices prevailing at the time of the inquiry." His estimate of the reproduction cost of the physical property was in fact rested upon "spot" peak prices current in October, 1940, which were considerably higher than the average prices over the past ten or five year periods.

But the fair value base is not necessarily confined to the hypothetical depreciated reproduction cost grounded on prices obtaining at the time of the inventory. These are not synonymous terms. Each case is governed in this regard by its own circumstances. The Board is empowered to determine what in the particular situation is a just and reasonable return; and it must needs have a broad discretion in the exercise of that authority, controlled by the statutory standard. Since rate-making is a legislative process, its exercise involves a range of legislative discretion. *O'Brien* v. *Public Utility Board,* 92 *N. J. L.* 587. The rate base is the fair value of the property used and useful in the public service. The depreciated reproduction cost is but a factor to be considered in the fixation of a rate reasonable as regards both the utility and the public. A corporation of this particular class performs a public function; and the public cannot be called upon for more than the fair value of the service rendered. The utility is entitled to a just return upon the fair value of the property at the time of its employment for the convenience of the public, and the public to protection against unreasonable exac-

tions. *Public Service Gas Co.* v. *Public Utility Board, supra: Smyth* v. *Ames,* 169 *U. S.* 466; 18 *S. Ct.* 418; 42 *L. Ed.* 819. Such reproduction cost is "a guide, but not a measure." *Dayton Power and Light Co.* v. *Public Utilities Commission,* 292 *U. S.* 290; 54 *S. Ct.* 647; 78 *L. Ed.* 1267.

A rate based upon an excessive valuation or upon property not used or useful in the rendition of the service subject to such regulation obviously would lay upon the individual user a burden greater than the reasonable worth of the accommodation thus supplied. The public is not to be laden with unreasonable or extortionate rates in order that dividends may be provided for the utility's stockholders. The base rate figure of fair value is determined by viewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying the public need. It is requisite that there be "an honest and intelligent forecast" of probable future values; and this of necessity includes the making of a fair prediction of the probable price and wage levels during a reasonable period in the immediate future, and a consideration as well of all other relevant facts and circumstances. *Denver Union Stock Yard Co.* v. *United States,* 304 *U. S.* 470; 58 *S. Ct.* 990; 82 *L. Ed.* 1469; *St. Joseph Stock Yards Co.* v. *United States,* 298 *U. S.* 38; 56 *S. Ct.* 720; 80 *L. Ed.* 1033; *Los Angeles G. & E. Corp.* v. *Railroad Commission,* 289 *U. S.* 287; 53 *S. Ct.* 637; 77 *L. Ed.* 1180; *McCardle* v. *Indianapolis Water Co.,* 272 *U. S.* 400; 47 *S. Ct.* 144; 71 *L. Ed.* 316.

There is no formula making for certainty in the exercise of this authority. The estimation of the fair value base is not controlled by arbitrary rules. It is not "a matter of formulas," but rather of "a reasonable judgment" grounded "in a proper consideration of all relevant facts." *Simpson* v. *Shephard,* 230 *U. S.* 352, 434; 33 *S. Ct.* 729; 57 *L. Ed.* 1511; *Los Angeles G. & E. Corp.* v. *Railroad Commission, supra; Atlantic City Sewerage Co.* v. *Public Utility Commissioners,* 100 *N. J. L.* 395. "An arbitrary date is as unlawful as an arbitrary rate." *Hackensack Water Co.* v. *Board of Public Utility Commissioners,* 98 *Id.* 41; *affirmed,* 100 *Id.*

177. In the words of Mr. Justice Cardozo, "An intelligent estimate of probable future values, and even indeed of present ones, is at best an approximation. The like is true of a forecast of the extent of future revenues. There is left in every case a reasonable margin of fluctuation and uncertainty." *Dayton Power and Light Co.* v. *Public Utilities Commission, supra.* Abnormally high prices for labor and material attendant upon an unstable market do not afford a just criterion of the value of property for rate purposes. There is in the continuing supervisory power of the administrative agency a wholly adequate remedy for the correction of inequities and a means of adjustment to shifting circumstances. *Hackensack Water Co.* v. *Board of Public Utility Commissioners, supra; Public Service Gas Co.* v. *Public Utility Board, supra; Railroad Commission of Texas* v. *Rowan & Nichols Oil Co.,* 311 *U. S.* 570; 61 *S. Ct.* 343; 85 *L. Ed.* 358.

Whether the due process clause of the Fifth or of the Fourteenth Amendment of the Federal Constitution be invoked, the reproduction cost of the property, less depreciation, is not conclusive of value, but is rather an element to be considered with all the circumstances in arriving at the fair value of the property in the particular case. *Smyth* v. *Ames, supra; Los Angeles G. & E. Corp.* v. *Railroad Commission, supra.* See, also, *Georgia Railway and Power Co.* v. *Railway Commission,* 262 *U. S.* 625; 43 *S. Ct.* 680; 67 *L. Ed.* 1144; *Simpson* v. *Shephard, supra.* And in the recent case of *Federal Power Commission* v. *Natural Gas Pipeline Co.,* 62 *S. Ct.* 736; 86 *L. Ed.* 699 (not yet officially reported), the federal Supreme Court dealt with a statute investing the Interstate Commerce Commission with power to fix a "just and reasonable" rate. As to the application of this standard, Chief Justice Stone, voicing the majority view, said: "The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details. * * * The Constitution does not bind ratemaking

bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

Here, the valuation fixed by the Board is fair and reasonable as between the utility and the public, and so is unassailable.

## II. *Depreciation:*

And we are of opinion that the Board made a liberal allowance for depreciation. The evidence reveals an excessive annual charge therefor, so much so that, as the Board found, if it be continued at the same rate, "an amount sufficient fully to retire all property now in existence would be accumulated long before the property would reach the end of its useful life." In its general sense, depreciation is "the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy and obsolescence." The cost of producing the service includes "an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered." *Lindheimer* v. *Illinois Bell Telephone Co.,* 292 *U. S.* 151; 54 *S. Ct.* 658; 78 *L. Ed.* 1182. If the allowance for depreciation be more than sufficient for the replacement of the capital consumed, the excess is not subject to capitalization for rate-making purposes. Here, the Board rested its findings as to the *quantum* of depreciation largely upon evidence adduced from its own engineer founded upon an inspection and comprehensive study of the property; and this is preferable to "mere calculations based on averages and assumed probabilities." *McCardle* v. *Indianapolis Water Co.,* 272 *U. S.* 400;

47 *S. Ct.* 144; 71 *L. Ed.* 316. See, also, *Pacific Gas and Electric Co.* v. *San Francisco,* 265 *U. S.* 403; 44 *S. Ct.* 537; 68 *L. Ed.* 1075. The opinion evidence is not of conclusive force. *Public Service Gas Co.* v. *Public Utility Board, supra: Dayton Power and Light Co.* v. *Public Utilities Commission, supra.* There rests upon the company the burden of establishing that the amounts charged to operating expenses for depreciation are not excessive; and it has not been sustained.

### III. *Going Concern Value:*

It is also assigned for error that the Board refused "to consider" the testimony of the Company's expert as to the *quantum* of "going value," and that "no allowance at all" was made for that as an intangible constituent of the fair value base.

The Board valued the property as a going concern, and thus allowed for this factor in its appraisal. It is not requisite that the going concern value be separately stated and appraised as such. When it has been regarded in the valuation of the business as a whole, the burden rests upon the utility to show that the "item has neither been adequately covered in the rate base nor recouped from prior earnings of the business." *Federal Power Commission* v. *Natural Gas Pipeline Co., supra; Denver Union Stock Yard Co.* v. *United States, supra.* "Going value is not something to be read into every balance sheet as a perfunctory addition." *Dayton P. & L. Co.* v. *Public Utilities Commissioner, supra.* The opinion of the Company's engineer was properly rejected as "too speculative to be entitled to weigh as evidence of the allowance which ought to be made for going value as an element of the rate base." It was based upon a purely theoretical "lag" in obtaining business for a five year period after the commencement of operations; and the premise is without support in the evidence. Nor has the Company sustained the burden of proving non-recoupment from prior earnings of the business. The evidence of the City's engineer was likewise ignored for the same general reason. His was an allowance for "the development and preliminary expense and the element of value

inherent in this property as a going concern, as different from the property reconstruction cost;" and the Board rejected it as a "lump sum allowance without any effort to lend objective support" to the witness' opinion. However, the Board considered that "there is an element of value in an assembled, established and successfully operated property, which is not present in property not so advanced" and "recognized this element to the extent which in its judgment is reasonable;" and thus it made such allowance for this item as was warranted by the proofs. There is no showing of arbitrary action.

The ascertainment of the rate base involves sound business judgment. The legislature has designed that this regulatory function shall be exercised by an agency expert in the intricacies and perplexities characteristic of the field; and their conclusions must needs have great weight in the determination of questions that call for specialized knowledge and experience.

### IV. *Operating Expenses:*

There is no substance to the contention that the Board erred in its disallowance of certain "operating expenses." There is no need to particularize. It suffices to say that thereby practical economies are effected without impairment of the service. Their rejection does not serve to make for injustice and unreasonableness in the rate fixed. And the allowance for annual future depreciation seems liberal in the circumstances. It was not confined to what reasonably appeared to have been the Company's actual retirement experience. Its property is in the main long-lived, and on the basis of past experience and conditions reasonably foreseeable the deduction seems wholly adequate for the maintenance of the integrity of the capital investment. The provisions for operating costs and legal services are sufficient. They are grounded in past experience, and are not fairly susceptible of the criticism that they "utterly ignore the trend of operating costs for the future." True, the future is uncertain, but mere uncertainty does not justify a rate based upon the assumption that there will be "a period of rising prices as to both labor

and material as well as a rising trend in taxes." If the prophecy were not fulfilled, a rate calculated on that hypothesis would be unfair to the public. As stated, the continuing supervisory power of the Board may be invoked to deal with extraordinary and unforeseeable conditions. The Board is not under a duty to indulge in speculation as to such matters. It is required only to make an honest and intelligent forecast of probable future values, considering all the circumstances relevant to the particular inquiry. *Vide West Ohio Gas Co. v. Public Utilities Commission*, 294 *U. S.* 63; 55 *S. Ct.* 316; 79 *L. Ed.* 761.

### V. *Confiscation:*

It follows from the foregoing that the valuation adopted by the Board is not confiscatory in contravention of the due process clause of the Fourteenth Amendment of the Federal Constitution. The rate is sufficient to yield "a fair return upon the reasonable value of the property at the time it is being used for the public," and thus the requirements of this constitutional provision are met. *Smyth* v. *Ames, supra; Los Angeles G. & E. Corp.* v. *Railroad Commission, supra; Denver Union Stock Yard Co.* v. *United States, supra.* The "lowest reasonable rate" is one which is not confiscatory in the constitutional sense. *Federal Power Commission* v. *Natural Gas Pipeline Co., supra.*

### VI. *Corporate Income Taxes:*

The City complains that the Board erred in considering income taxes assessed against the Company as an "operating expense." The point is untenable.

In determining a rate of return that will answer the test of reasonableness, the federal income tax is deductible. *Galveston Electric Co.* v. *Galveston*, 258 *U. S.* 388; 42 *S. Ct.* 351; 66 *L. Ed.* 678. It was so treated without question in *Federal Power Commission* v. *Natural Gas Pipeline Co., supra.* The nature of this charge may be a circumstance to be considered in determining what is a fair rate of return in the particular circumstances; but it cannot be said that here it has resulted in an excessive rate.

VII. *Costs of the Litigation:*

The City also challenges the inclusion in the operating expenses of $30,000 to cover the cost of the proceedings, amortized over a period of approximately ten years. This was rested upon "tentative information available to the Board;" and the Company was directed to submit, "as soon as practicable * * *, an itemized statement of the actual expenditures" for the purpose. It is said that since the Company sought an increase in rates averaging more than 26% and was granted but 6%, this allowance should not have been made, and that, at all events, it should not have been made without proof of its reasonableness.

The Company did prevail in substantial part; and in the fixation of a rate to yield a fair return upon the value of the property, it was needful that the expense thus incurred be considered. And, in view of the wide experience of the Board in such matters, we are not disposed to disturb its findings in this respect. The Board was fully advised as to the character of the service provided; and it is not suggested that the deduction is unreasonable as to amount. Moreover, the difference, if any, would not affect the rate to such an extent as to warrant interference with the action of the Board.

Judgment affirmed, with costs.