CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD
COMPANY, Appellant, vs. PUBLIC SERVICE COMMIS-
SION, Respondent.

*November 7—December 4, 1951.*

214

For the appellant there were briefs by *Bender, Trump, McIntyre, Trimborn & Godfrey* of Milwaukee, and *Aberg, Bell, Blake & Conrad* of Madison, attorneys, and *Rodger S. Trump* of Milwaukee of counsel, and oral argument by *Rodger S. Trump*.

For the respondent there was a brief by the *Attorney General* and *William E. Torkelson,* chief counsel for the Public Service Commission, and oral. argument by *Mr. Torkelson*.

CURRIE, J.    The appellant railroad raises the following contentions:

(1) The commission's decision, findings, and order are contrary to the commerce clause of the United States constitution.

(2) The commission's decision, findings, and order constitute a taking of the railroad's property without due process of law in violation of the Fourteenth amendment to the United States constitution.

(3) The commission's decision, findings, and order are arbitrary and capricious.

(4) The commission's decision, findings, and order are unsupported by any substantial evidence.

We find it more convenient to pass upon the contention of whether the commission's decision, findings, and order are supported by substantial evidence in the record in our consideration of appellant's first contention, that the commerce clause of the United States constitution has been violated, rather than passing on the former question separately. Therefore, these two contentions will be considered together, because of the intimate connection between the two, it being necessary to consider the weight to be given to the commission's findings in disposing of the constitutional question.

Train No. 16, the "Olympian Hiawatha," is a through interstate train operating from Seattle to Chicago, a distance of two thousand one hundred ninety-eight miles, on a forty-five hour schedule. This train makes but three scheduled stops in Wisconsin, those being at La Crosse, Portage, and Milwaukee. Appellant urges that the commission's order requiring the railroad to schedule a stop of this train at Tomah places an undue burden upon interstate commerce, and therefore violates the commerce clause of the United States constitution.

The general principles of law bearing on this question are well stated in 44 Am. Jur., Railroads, p. 589, sec. 372, as follows:

"When a station, county seat, or other place has inadequate train facilities, a state may compel interstate or mail trains to stop at such station or place, to a number necessary to render such station or place adequate train service. Although requiring such stopping is a direct interference with interstate commerce it is permitted under circumstances making it a reasonable exercise of the police power. Where, however, the local facilities are adequate, the obligations of the railroad are performed, and requirement of the stopping of interstate or mail trains by a state becomes an improper and illegal interference with interstate commerce or the carrying of the mails, whether the interference be directly by the legislature or by its command through the orders of an administrative body. Whether a station or place has reasonable train service is a question of fact to be determined by the situation and general surroundings of the station or place."

In *St. Louis-San Francisco R. Co. v. Public Service Comm.* (1923), 261 U. S. 369, 43 Sup. Ct. 380, 67 L. Ed. 701, it was held that where local facilities are inadequate, a state can compel an interstate train to stop so as to furnish reasonable adequate service, but may not do so if local facilities and service are adequate. See also *Morgan v.*

*Virginia* (1946), 328 U. S. 373, 66 Sup. Ct. 1050, 90 L. Ed. 1317, footnotes 16 and 17, for a collection of United States supreme court cases on the subject.

The first question to be determined, therefore, is whether the transportation facilities at Tomah are adequate or are inadequate. The commission, in the opinion portion of its order of July 20, 1950, states:

"The commission continues to be of the opinion that the Milwaukee Road has not been and is not now giving the people of Tomah reasonably adequate eastbound passenger service between the hours of 6 a. m. and 12 m. and that there is need for such service, and for that reason again reaffirms and again makes its previous finding of fact made in its opinion and order of December 15, 1949, 'That public convenience and necessity and reasonably adequate service by the Chicago, Milwaukee, St. Paul & Pacific Railroad Company require the establishment of additional service to Milwaukee at Tomah between the hours of 6 a. m. and 12 noon daily.' "

The next question which confronts us is that of how much weight is to be given on judicial review to such finding by the commission of adequate service. Sec. 195.06, Stats., provides, "All orders, determinations, and decisions made by the commission . . . shall be *prima facie* lawful, and all regulations, practices, and service prescribed by the commission shall be in force and shall be *prima facie* lawful and reasonable, until finally found otherwise upon judicial review thereof instituted pursuant to ch. 227."

Sec. 227.20, Stats., prescribes the scope of review by the court of findings and orders of administrative bodies, such as the Public Service Commission, and this statute provides as follows:

"(1) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, testimony thereon may be taken in the court. The court may

affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions, or decisions being:

"(a) Contrary to constitutional rights or privileges; or

"(b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law; or

"(c) Made or promulgated upon unlawful procedure; or

"(d) Unsupported by substantial evidence in view of the entire record as submitted; or

"(e) Arbitrary or capricious.

"(2) *Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it.* The right of the appellant to challenge the constitutionality of any act or of its application to him shall not be foreclosed or impaired by the fact that he has applied for or holds a license, permit, or privilege under such act."

Appellant points to the conjunction "or" which joins subs. (1) (a) and (1) (b) of sec. 227.20, Stats., and argues that when a constitutional question is raised, as is in this instance, the courts are not bound to accept findings of fact of the commission supported by substantial evidence, but instead the reviewing courts must make their own independent fact determination from the record presented before the commission. We cannot accept this construction of the statute propounded by appellant, for it is our construction of the statute that we must accept findings of fact of the commission, even where a constitutional question is involved, if the commission's findings of fact are supported by substantial evidence. Even if a finding of fact by the commission were supported by substantial evidence, the order based upon such finding might be "contrary to constitutional rights and privileges." In other words, we do not believe it would be a reasonable construction of the statute to construe it as meaning that the reviewing court must accept findings of

an administrative body supported by substantial evidence, *except in those cases where a constitutional question is raised.*

Appellant, as a further reason for urging this court to make its own independent determination of facts, and not accept that made by the commission, advances the argument that the United States supreme court has held that it will make its own independent determination of facts, and not be bound by the findings of a state administrative agency, where a question of violation of the United States constitution is at issue. In support of this argument, appellant's brief cites a number of United States supreme court decisions so holding. While most of such cited cases are not recent in date, that of *Hooven & Allison Co. v. Evatt* (1945), 324 U. S. 652, 659, 65 Sup. Ct. 870, 89 L. Ed. 1252, is a recent case, and therein it is stated:

"In all cases coming to us from a state court, we pay great deference to its determinations of fact. But when the existence of an asserted federal right or immunity depends upon the appraisal of undisputed facts of record, or where reference to the facts is necessary to the determination of the precise meaning of the federal right or immunity, as applied, we are free to re-examine the facts as well as the law in order to determine for ourselves whether the asserted right or immunity is to be sustained. *Kansas City Southern R. Co. v. Albers Commission Co.* 223 U. S. 573, 591; *Truax v. Corrigan,* 257 U. S. 312, 325; *First Nat. Bank v. Hartford,* 273 U. S. 548, 552, and cases cited; *Fiske v. Kansas,* 274 U. S. 380, 385, 386; *Norris v. Alabama,* 294 U. S. 587, 589, 590."

The instant case does not involve a question of a "federal right or immunity" in the sense used in the above quotation from *Hooven & Allison Co. v. Evatt, supra,* and therefore such quotation is not particularly in point, and the authority of the earlier United States supreme court cases cited by appellant is much shaken by the latest pronouncement on the subject contained in the opinion written by Mr. Chief

Justice VINSON in the case of *Alabama Public Service Comm. v. Southern R. Co.* (1951), 341 U. S. 341, 348, 71 Sup. Ct. 762, 95 L. Ed. 1002, which stated:

"And, whatever the scope of review of commission findings when an alleged denial of constitutional rights is in issue, it is now settled that a utility has no right to relitigate factual questions on the ground that constitutional rights are involved. *New York v. United States,* 331 U. S. 284, 334–336 (1947); *Railroad Comm. of Texas v. Rowan & Nichols Oil Co.* 311 U. S. 570, 576 (1941)."

The conclusion that the United States supreme court will not redetermine the facts where such facts have been determined by a state administrative agency, such as the commission in this instance, is further strengthened by footnote 11 to the decision in *Alabama Public Service Comm. v. Southern R. Co. supra,* reading as follows (p. 349):

"Compare such cases as *Bacon v. Rutland R. Co.* 232 U. S. 134 (1914), where state judicial review procedures plus review in this court were thought to be inadequate. This inadequacy derived from the rationale that the federal right of a utility to be protected from confiscation of its property depended upon 'pure matters of fact' to the extent that a *de novo* hearing of such facts in a federal court was essential to the protection of constitutional rights. *Prentis v. Atlantic Coast Line R. Co.* 211 U. S. 210, 228 (1908). See Lilienthal, The Federal Courts and State Regulation of Public Utilities, 43 Harvard Law Review 379, 424 (1930). The decisions in *Railroad Comm. of Texas v. Rowan & Nichols Oil Co.* 311 U. S. 570, 576 (1941), and *New York v. United States, supra,* holding that due process does not require relitigation of factual matters determined by an administrative body, eliminated the premise upon which equitable relief in *Bacon* rested."

Therefore, accepting the premise that this court is bound to accept the findings of fact of the commission, if the same are supported by substantial evidence, we will now proceed to examine the evidence in the record which tends to support

the finding and conclusion of the commission that Tomah has inadequate railroad transportation service.

According to the 1950 census, Tomah's population is four thousand seven hundred eighty-five; a large U. S. Veterans'. Administration Hospital is located there, having approximately nine hundred patients and a staff and personnel of six hundred thirty-eight. Incoming and discharged patients require the use of railroad transportation, and during a single month, seven hundred eighty-six visitors came to the hospital to contact their relatives who were patients there.

The only railroad serving Tomah is that of the appellant. According to appellant's own records, its earnings from freight at Tomah for the year 1948 were $355,434.20, and its earnings from passengers at Tomah for such year were $25,293.46. For the first eight months of 1949, the earnings from freight at Tomah were $238,607.34, and the earnings from passengers at Tomah were $21,890.16.

The only eastbound morning train which has a scheduled stop at Tomah is train No. 56, which arrives at 1:16 a. m.; another eastbound train, No. 18, will stop at Tomah at 3:44 a. m., if there are any passengers on board from points as far west as Aberdeen, South Dakota, or beyond; but residents of Tomah desiring to go to Milwaukee or Chicago have no way of knowing in advance whether such train will stop at Tomah or not. The only other eastbound passenger service at Tomah is train No. 58 which stops at 2:59 p. m. This is a local which gathers passengers at stations along the way and takes them to New Lisbon where they can catch the afternoon Hiawatha which arrives at Milwaukee at 5:55 p. m., and at Chicago at 7:15 p. m.

It can hardly be contended that train No. 56 is adequate eastbound service, because it means that Tomah residents have to get up in the middle of the night, and then arrive at Chicago or Milwaukee hours before places of business are

open. The service provided by train No. 58 and the connection at New Lisbon with the afternoon Hiawatha is also not adequate, because passengers having business in Milwaukee or Chicago arrive too late to transact such business and must stay overnight there and attend to their business the next day. If eastbound train service were provided between the hours of six in the morning and noon, passengers having business to transact in Milwaukee or Chicago would arrive in time to transact such and take the night train back to Tomah. The testimony of the secretary of the Tomah chamber of commerce, and of various businessmen who use the railroad in making business trips to Milwaukee and Chicago, discloses the need of such one-day train service to Milwaukee and Chicago and return.

The railroad does operate two through interstate eastbound morning trains passing through Tomah which make no scheduled stop there. One is train No. 6, the morning Hiawatha, which operates daily from Minneapolis to Chicago, and is scheduled to pass through Tomah at 11 :12 a. m., and arrives at Milwaukee at 1 :25 p. m., and at Chicago at 2 :40 p. m. This is the train that was required to make a scheduled stop at Tomah during the sixty-day trial period specified in the order of the commission, dated February 23, 1949. The other is train No. 16, the "Olympian Hiawatha" operating between Seattle and Chicago, which is scheduled to pass through Tomah at 10 :14 a. m. daily; and the only stops this train makes in Wisconsin are at La Crosse, Portage, and Milwaukee. This is the train which the commission, in its latest order of July 20, 1950, requires be stopped at Tomah.

The need for eastbound train service at Tomah between the hours of six a. m. and noon is further substantiated by the results shown during the sixty-day trial period in March and April, 1949, when train No. 6 stopped at Tomah. A

summary of such results appears in the opinion of the commission rendered August 3, 1949, as follows:

"From the data submitted for March and April it may be concluded that approximately seven passengers a day use the Tomah stop for travel southeastward, that one passenger daily would otherwise take the afternoon train to New Lisbon, that two would otherwise go to Sparta and board train No. 6 there, and that four new passengers availed themselves of the service. The data for May indicate the loss of one of the new passengers and the gain of an additional two passengers that would otherwise go to Sparta. Apparently there are from one to three passengers per day that arrive at Tomah on train No. 6. The combined use of train No. 6 for boarding at Tomah and Sparta is thirteen to fourteen passengers a day."

Train No. 6 stops daily at 10:55 a. m. at Sparta, sixteen miles to the west of Tomah, and the railroad argues that this provides adequate eastbound rail service to the residents of Tomah and vicinity. It is possible to take a bus from Tomah to Sparta but such bus arrives a full hour before train No. 6 is due to stop at Sparta, and the bus terminal is a full mile from the depot, which is hardly adequate service, especially in times of bad weather. It is also possible to engage a taxi to take one from Tomah to Sparta, but the cost of so doing is excessive. It is also possible to drive one's own automobile to Sparta, but inasmuch as the train on the return trip from Milwaukee and Chicago stops at Tomah, this means either continuing on the train through Tomah to Sparta to pick up the car and driving it back, or else having some other person drive the car to Sparta and then drive it back to Tomah.

Appellant also points out that Tomah is served by Northland Greyhound bus service from Milwaukee to Chicago, two of which buses leave between 6 a. m. and noon, but the scheduled time between Tomah and Chicago is approximately eight hours, or twice that of railroad service.

This review of the evidence clearly establishes that the finding of the commission as to inadequate eastbound rail transportation at Tomah, and that public convenience and necessity require the establishment of additional eastbound service from Tomah between the hours of 6 a. m. and 12 noon daily, is supported by substantial evidence.

This then brings us to the question of whether the stopping of train No. 16, the Olympian Hiawatha, is a reasonable exercise of the state's police power in order to provide Tomah with adequate railroad transportation. The answer of the commission to the railroad's objections on this score, as set forth in the commission's opinion of July 20, 1950, is as follows:

"The commission is aware of the objections of the Milwaukee Road to stopping No. 16, which are to the effect that No. 16 is a transcontinental train; that it is late on many occasions; and that it does not have equipment and accommodations for local passengers. It is recognized that, if this train is stopped at Tomah, it may result in some difficulties to the railroad. However, we venture to say that no matter what method would be selected to furnish this additional eastbound passenger service to Tomah, there will be some difficulties and expense to the railroad; and if this is the controlling criteria, the people of Tomah would be in a position where they probably never would get such service.

"In any event, the commission feels that as a practical matter the difficulties suggested by the railroad are not too difficult. It does not seem that the time necessary to make a stop at Tomah, involving as it would a matter of a few minutes, would be too consequential, especially in view of sec. 195.29 (1) as it now exists by reason of the enactment of ch. 478, Laws of 1949, which affords the railroad an opportunity to adjust its speed limits if necessary to overcome any time lost in making this stop. The fact that No. 16 may on occasion be late is something which might happen in case of any train operation.

"No. 16 carries reclining seat coaches, the seats on which are reserved, and under ordinary circumstances there should be sufficient space on No. 16 to accommodate passengers from Tomah who do not desire first-class accommodations. If the volume of traffic from Tomah proves too great that No. 16 cannot handle it, there is always the possibility that an extra coach could be attached at La Crosse. It is also recognized that certain types of transportation are not honored on No. 16. It is felt that this will affect a comparatively small number of people and that they can be accommodated by other trains."

The evidence amply substantiates all of the foregoing statements of fact, except the possibility of attaching an extra coach at La Crosse, as apparently no evidence was presented as to such possibility. The evidence did establish that a period of five minutes would be all that would be lost in stopping this train at Tomah, taking into consideration the deceleration in speed in making the stop and starting up again, as well as the time required for the stop itself. Furthermore, there also was testimony that train No. 16 has a better opportunity to make a better on-time performance than train No. 6, so that stopping train No. 16 is not so likely to cause it to be late in arriving at Chicago as stopping train No. 6 proved to be.

Sec. 227.20 (2), Stats., requires that this court in reviewing the order of the commission here attacked, must accord due weight to "the experience, technical competence, and specialized knowledge" of the commission, "as well as discretionary authority conferred upon it." This court cannot say as a matter of law that stopping train No. 16 at Tomah, as ordered by the commission, constitutes an unreasonable interference with interstate commerce, the commission having found to the contrary upon substantial evidence.

Appellant makes no claim that requiring the stopping of train No. 16 would constitute taking of its property without due process of law in violation of the Fourteenth amendment

of the United States constitution. It does, however, raise this objection as to the three alternative methods of providing adequate eastbound train service to Tomah between the hours of 6 a. m. and 12 noon which were considered by the commission and might be deemed to be embraced in the alternative portion of the commission's order of July 20, 1950. Such order required the stopping of train No. 16, or in the alternative, the providing of other eastbound passenger service between 6 a. m. and 12 noon daily. The three methods considered by the commission were that of operating an additional local train from La Crosse to Portage so as to make connections with train No. 6, the operating of a self-propelled motorcar from Tomah to Sparta on the railway of appellant, or the providing of bus service from Tomah to Sparta to make connections with train No. 6. It is the contention of the railroad that any of these alternatives would place such additional expense upon it that it would lose money as a result thereof.

The fact that the railroad may sustain pecuniary loss if it elects to furnish one of the three alternative methods of providing adequate eastbound transportation service to Tomah does not constitute a taking of property without due process of law. The fact that there may be a pecuniary loss is only one factor to be considered. In the case of *Atlantic Coast Line v. N. Carolina Corp. Comm.* 206 U. S. 1, 26, 27 Sup. Ct. 585, 51 L. Ed. 933, the court said:

*"This is so because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result.* It follows, therefore, that the mere incurring of a loss from the performance of such a duty does not in and of itself necessarily give rise to the conclusion of unreasonableness, as would be the case where the whole scheme of rates was unreasonable under the doctrine of *Smyth v. Ames* or under the concessions made in the two propositions we have stated.

Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. *As the duty to furnish necessary facilities is coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance."* (Emphasis supplied.)

We find no merit, therefore, in appellant's contention that the order of the commission violates the due-process clause of the Fourteenth amendment.

Appellant also attacks the order of the commission as being *"arbitrary or capricious"* within the meaning of sec. 227.20 (1) (e), Stats. It bases this attack upon the fact that the order of the commission requires the railroad to stop train No. 16, "or in the alternative, shall provide other eastbound passenger service between 6 a. m. and 12 noon daily."

One of the alternative methods of providing such eastbound passenger service as established by the evidence in the record would be for the railroad to operate a bus from Tomah to its station at Sparta, so as to make connections with the scheduled stop of train No. 6 which stops at Sparta at 10:55 a. m. The lowest cost estimate to the railroad of so doing was $13.40 per day.

It would clearly seem that the alternative portion of the commission's order was inserted for the benefit of the railroad and therefore it is in no position to claim that it was prejudiced thereby by asserting that the order was arbitrary or capricious in this respect.

*By the Court.*—Judgment affirmed.

BROWN, J., took no part.